TURNER *et al. v.* LEATHERS *et ux.*

(*Nashville*, December Term, 1949.)

Opinion filed July 15, 1950.

Petition to Rehear Denied August 31, 1950.

JAMES R. BROWN, of Centerville, and THOMAS HARRIS, of Linden, for complainants.

Logan Beasley, of Centerville, for defendants.

Mr. Justice Prewitt delivered the opinion of the Court.

This cause involves the legality of certain transfers of realty and personalty. The Chancellor rendered a decree setting aside the transfers and the Court of Appeals reversed this decree. Certiorari has been granted by this Court and the cause argued.

This cause involves certain realty and personalty owned by R. H. Leathers, a resident of Hickman County, who died intestate on November 24, 1944. Mr. Leathers was ninety years old at the time of his death. Mr. Leathers' wife died in 1939, and his closest of kin were his nephews and nieces. Following the death of his wife, Mr. Leathers continued to live on his farm until his death with the exception of about eighteen months. Defendant, M. L. Leathers, is a nephew of Mr. Leathers, and he and his wife lived on the farm of his uncle for about fifteen years prior to his death. M. L. Leathers had

transacted most of his uncle's business for the last three or four years of the latter's life. During the last three months of Mr. Leathers' life he was feeble and tottery. Part of these last years M. L. Leathers and his family lived in the home of Mr. Leathers and part of the time they lived in a tenant house on his farm. They did his washing and ironing, prepared his meals and kept his house. He was a member of their family and was treated as such. He seemed to have a deep affection for them and their children.

About twenty-one months before Mr. Leathers' death he went to the home of his niece, Mrs. Alice Ayers, and lived there about eighteen months. This stay with his niece seems for the most part to have been unpleasant. He quarreled with his niece and her husband over his board bill and left their home on September 5, 1944, and returned to his own home, where M. L. Leathers and his family were living. Mrs. Ayers stated at the time Mr. Leathers left her home that she would not take him and take care of him for every thing he had.

In 1942, Mr. Leathers made a will and left all his property to his nephew, M. L. Leathers, and the members of his family. He became dissatisfied with the will because he was afraid "it would not stand," so he destroyed it.

On January 21, 1943, Mr. Leathers conveyed a tract of land of 125 acres to M. L. Leathers as a gift. The County Register of Hickman County prepared the deed at the suggestion of Mr. Leathers, who explained to this official at the time that the deed was a gift. The Chancellor held this deed valid.

When Mr. Leathers returned from his niece's home to his own home on September 5, 1944, he was confined to his home until he died about three months later.

On September 8, 1944, Mr. Leathers signed a check for $1,000, payable to Etta Leathers, wife of M. L. Leathers, and this check was endorsed by Etta and M. L. Leathers. On September 25, 1944, Mr. Leathers executed and delivered to M. L. Leathers a deed conveying to him a farm of 60 acres for a recited consideration of $1,000, but no consideration was paid.

On September 29, 1944, Mr. Leathers executed and delivered to M. L. Leathers a deed conveying to him a farm of 310 acres for a recited consideration of $1,100, but no consideration was paid.

On October 7, 1944, Mr. Leathers gave M. L. Leathers a check for $100 payable to cash.

The automobile of Mr. Leathers was given to M. L. Leathers about this time. It was worth $200.

Mr. Leathers understood that the recited considerations in the deeds were not actually paid, but they were stated in the deeds to make them "legal." M. L. Leathers and his wife agree that there were no considerations to support any of these transfers but that they were gifts.

Mr. Leathers told many people that Luther (M. L. Leathers) and his family had been good to him and that he intended for them to have what he had. The proof shows that he was a man of sound mind at the time these transfers were made and that the property in question was worth about $4,000. All his real property was transferred to M. L. Leathers, and also all his personal property, except $2,700 in Government bonds. Defendants contend that Mr. Leathers intended to transfer these bonds to them, but that they understood it would be necessary for him to go to the bank and this was never done.

The Chancellor held that a relationship of confidence existed between Mr. Leathers and defendants; that defendants were the dominant parties; that it was necessary for defendants to show that Mr. Leathers had the benefit of independent counsel and advice in connection with these transfers to them and that they failed to carry that burden.

It should be borne in mind that Mr. Leathers came back to his home on September 5, 1944, and died there some three months later. He was ninety years old and feeble in body and mind. He was then so feeble and weak that he could not walk but had to be carried to the bed. Dr. Capps attended him in the summer of 1944, while he was at the home of Mrs. Ayers. Dr. Capps testified that Mr. Leathers was then suffering from hardening of the arteries and chronic Bright's disease, and was so feeble that he could not look after himself but required constant attention of others to care for him. Mr. Leathers also had some other disease which caused him to have frequent "spells," which would render him unconscious while they lasted.

Some time before Mr. Leathers was brought back home and while he was at the home of Mrs. Ayers, Luther (M. L. Leathers), she says, referred to the gift of the 125 acres and said, "I get the rest—the rest he has." While Luther denies that he said that, this was what was done. Mr. Leathers had been home only three days when Luther, or his wife, filled out the $1,000 check to her for him to sign. The gift of the 60 acres followed a few days later, then four days later the gift of the 310 acres, two days later the gift by check of $275 to Luther's son (the Chancellor let this check stand because the son had not been made a party to this suit), and six days later the gift of the $100 by check filled out

to cash by Luther and endorsed by him, and the gift of the automobile, the gift of the bonds, and the gift of the household goods and everything on the place. The gift of the bonds was never consummated, as the bonds were kept at a bank and could not be transferred without Mr. Leathers going to the bank to sign the transfer, or so they understood. Mr. Leathers was never able to go to the bank and so there was no transfer of the bonds.

The deeds had been written by the County Register, and Luther (M. L. Leathers) took a notary public to Mr. Leathers' home to get his acknowledgments. The notary public testified that he read the deeds over to Mr. Leathers and that he understood them, or appeared to. The evidence shows that when the deeds were signed and acknowledged by Mr. Leathers, Luther and his wife were not in the room.

It may be that the mentality of Mr. Leathers did not actually fall below the line defining the limits of legal mentality; that he still had mind enough to know what he was doing, or what he intended to do. It is not a question of whether he knew what he intended to do, but how this intention was produced, whether it was by abuse of a confidential and fiduciary relation.

■■ The rule of independent advice means that the adviser must not only be competent but independent.

"Proper independent advice in this connection means that the donor had the [preliminary] benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself

of his proposed benefactions.'' *Post* v. *Hagan,* 71 N. J. Eq. 234, 243, 65 A. 1026, 1027, 124 Am. St. Rep. 997; *Slack* v. *Rees,* 66 N. J. Eq. 447, 59 A. 466, 69 L. R. A., 393; *Roberts* v. *Chase,* 25 Tenn. App. 636, 166 S. W. (2d) 641; *Peyton* v. *William C. Peyton Corp.,* 23 Del. Ch. 321, 7 A. (2d) 737, 123 A. L. R. 1482.

'' 'Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, *although the transaction could not have been impeached if no confidential relation had existed.' ''* Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 3, Section 956, p. 792.

This principle pervades the whole reach of confidential and fiduciary relations: trustee and cestui, *Knox County* v. *Fourth & First Nat. Bank,* 181 Tenn. 569, 182 S. W. (2d) 980, principal and agent, *McNeill* v. *Dodson-Bainbridge Realty Co.,* 184 Tenn. 99, 195 S. W. (2d) 626, attorney and client, parent and child, guardian and ward, physician and patient, nurse and invalid, confidential friend and adviser, and every relation which gives one person "dominion or influence" over another. *Bayliss* v. *Williams,* 46 Tenn. 440; *Miller* v. *Proctor,* 24 Tenn. App. 439, 145 S. W. (2d) 807, 808; *Roberts* v. *Chase,* 25 Tenn. App. 636, 166 S. W. (2d) 641.

In the present cause, Mr. Leathers came back to his home, ninety years of age, weak in mind and body, and was bedridden. There is no doubt that his nephew and his wife had "dominion" over him. They carried his

meals to him, nursed him as a patient, and the wife did his washing.

It is true that the notary public read over the deeds to Mr. Leathers before he acknowledged them, and testified that, in his opinion, he thought Mr. Leathers knew what he was doing. However, under the authorities quoted from and cited, this is not sufficient.

Under the circumstances presented in this cause, on account of the age, physical and mental deterioration of the donor, and where he is under the unquestioned "dominion and control" of the donee, it is necessary that he have competent, independent advice, free from the influence of the donee, in order for the gift to stand.

This being our view of the questions involved, the decree of the Court of Appeals is reversed and that of the Chancellor affirmed.

All concur.