Charles "Chuck" McGILL, Jr., et al.

v.

Anna Lee Adams HEADRICK et al.

Court of Appeals of Tennessee,
Eastern Section.

Oct. 13, 1978.

Certiorari Denied by Supreme Court
Feb. 12, 1979.

Robert L. Ogle, Jr., of Ogle, Wade & Vickers, Sevierville, for appellants.

Ben D. Brabson, Jr., of Brabson & Bradfield, Sevierville, for appellees.

## OPINION

SANDERS, Judge.

The pertinent issue in this case involves setting aside a deed to real estate.

A. V. Adams died intestate in Sevier County in 1972. His estate consisted of a small amount of personal property and a farm containing approximately 125 acres. He had no children and left surviving his widow, the Defendant-Appellant, Anna Lee Adams (Headrick). His next of kin were three brothers, Earl Adams, Leonard Adams and Ervie Adams. One brother and one sister had predeceased the intestate and they each left children surviving. The deceased's brother, Ed Adams, had two children, Appellee Margaret Fowler, and Roy E. Adams. The deceased sister left seven children, being the Plaintiffs, Charles "Chuck" McGill, Jr., Hugh "Jerry" McGill, Perman "Pete" Giles McGill, and Plaintiff-Appellees, Ima Lee Bennett, Robert E. McGill, Doris Hampton, and Ralph McGill.

During his lifetime the deceased, A. V. Adams, had told his brother, Leonard Adams, that if he should predecease his wife, the Defendant, he wanted her to have everything he owned. Shortly after his death on July 18, 1972, Earl, Leonard, and Ervie Adams, each of whom owned a one-fifth interest in the farm subject to Defendant's homestead and dower, executed a deed to the Defendant for their interests in the property.

The Defendant was A. V. Adams' second wife and they had been married a little over three years when he died. Consequently, she was not acquainted with some of the nephews and nieces and had only a limited acquaintance with the others. For this reason it was decided Mr. Leonard Adams would contact the nephews and nieces about conveying their interest in the land to the Defendant. Mr. Adams contacted the nephews and nieces concerning conveying their interests to the Defendant and all but three of them executed deeds for their interests in the property. After the three brothers had conveyed their interests in the property, but before any of the nephews and nieces had conveyed their interests, the state filed a condemnation suit to condemn 26 acres of the land for highway purposes. At the time the suit was filed the state deposited $5,200 as the value of the land taken. However, when the case was tried in March, 1974, the jury awarded $33,868.90 in damages.

In August, 1975, the three nephews who had not conveyed their interests in the property filed suit in the Chancery Court seeking to have the balance of the land sold for partition. These Plaintiffs were Charles "Chuck" McGill, Jr., Hugh "Jerry" McGill and Perman "Pete" Giles McGill. They are three of the seven children of the deceased sister and each owned a ⅒₅ interest, subject to Defendant's homestead and dower. The complaint also asks that the funds in the clerk's office from the condemnation suit be impounded in the hands of the clerk and master; that the interests of the respective parties in the funds be determined; that the Defendant be required to render an accounting as administratrix of her husband's estate. It also named the remaining nephews and nieces as parties defendant and asked the Court to determine what interest their deed to the Defendant had conveyed to her. All of the nephews and nieces except Roy E. Adams filed answers and asked to be realigned as Plaintiffs.

Ima Lee Bennett, Robert E. McGill, Doris Hampton and Ralph McGill filed a cross

complaint in which they sought to have their deed to the Defendant set aside. In general, they contended they thought they were signing a deed to a cemetery lot and not a deed to the farm. They also seek a pro rata share of the funds in the condemnation proceeding.

The case was heard by a Special Chancellor sitting by interchange. The Chancellor held the deed from the Plaintiffs, Ima Lee Bennett, Robert E. McGill, Doris Hampton and Ralph McGill to' the Defendant was void insofar as the conveyance of their interests in the farm was concerned, but it was valid and binding insofar as the conveyance of their interests in the cemetery lot was concerned. He also held each of these four Plaintiffs had a ⅟₃₅ interest in the farm and a ⅟₃₅ interest in the proceeds from the condemnation after payment of expenses. He held Margaret Fowler had a ⅟₁₀ interest in the proceeds from the condemnation but, since neither she nor her brother, Roy E. Adams, contested the validity of their deed to the Defendant, it was valid. He ordered the Defendant's homestead and dower set aside to her and the remainder of the property sold for partition.

The Defendant has appealed and assigned error. In her brief the only part of the Chancellor's decree which the Defendant challenges is the voiding of the deed as to the four Plaintiffs' interests in the farm.

The Chancellor filed a memorandum opinion and his reasons for setting the deed aside as to the farm were (1) lack of consideration, (2) failure of the Defendant to disclose to the Plaintiffs what property was included in the deed, (3) Plaintiffs did not read the deed before signing it, (4) since the Defendant was the administratrix of her husband's estate, a fiduciary relationship existed between her and the Plaintiffs, and (5) the Defendant had the benefit of counsel and the Plaintiffs did not have the benefit of independent advice.

It appears the Chancellor was impressed by the fact it was not reasonable that Plaintiffs would have conveyed their interests in a valuable piece of property to the Defendant without being paid for it. As he put it, ". . . none of the litigants were close or even knew each other enough to negotiate."

The record reveals the condemnation suit was filed September 29, 1972. The deed from the Plaintiffs to the Defendant is dated November 22, 1972. The state deposited $5,200 as the value of the land taken. This was approximately $200 per acre. Each of the Plaintiffs' interests in the property was ⅟₃₅. Their portion of these proceeds would have been less than $150 each. Based on these figures each of their interests in the farm would have had a value of approximately $700. It was only after the jury returned a verdict of over $33,000, almost two and a half years after the deed was executed, that it appeared to be valuable property.

The deed was executed by Plaintiffs, Ima Lee Bennett, Ralph E. McGill and Doris A. Hampton, at the same time. They were all at the home of Mrs. Hampton in Knoxville at the time. At the time of the execution of the deed the Defendant and Leonard Adams, as well as Betty Rose, a notary public, were present. Ima Lee Bennett testified her home was in Toledo, Ohio, and she was visiting her sister, Mrs. Hampton, in Knoxville at the time she signed the deed. She testified she did not read the deed prior to signing it. She said the deed was handed to her folded over and the Defendant told her it was a deed for a cemetery lot. She said she was not deprived of an opportunity to read the deed had she desired to do so. Although she insisted she thought she was signing a deed only for a cemetery lot, on cross-examination she testified her uncle, Leonard Adams, had called her in Toledo. He told her about the condemnation ·suit. She said, "Leonard Adams told me how it was about each part and how much it would be an heir. He said it wouldn't be over, our part, over $600 or $700 when we got through with attorneys. That us kids would probably have $300 or $400 out of the estate. That's what he told me over the phone." She further testified:

"MRS. BENNETT: I don't have no lies to tell. You can ask me anything. I don't care. I don't go around lieing if that's what you're inferring.

"Mr. Ogle:

"Q But you knew the State was taking this property?

"A Taking the 26 acres.

"Q You knew that when you signed this deed?

"A Yes, but what it was worth, that I don't know.

"Q You thought maybe you would get $300. or $400. out of it, and you were willing to give that to Mrs. Adams, weren't you?

"A The $300. or $400. correct because it would cost me that to drive backwards and forwards from here to Toledo.

"Q It's just a matter, you were willing to deed your interest in the land the State was taking for the $300. or $400. Is that right?

"A I didn't want to drive back and forth down here."

Plaintiff Doris Ann Hampton testified she did not read the deed prior to signing it. The Defendant told her it was for cemetery lots. On cross-examination she testified as follows:

"Q You knew the State was condemning or taking some of this property, the 26 acres, didn't you?

"A When?

"Q I say you knew it, didn't you?

"A I knowed later on.

"Q Did you know it at the time you signed this deed?

"A I knowed the State was going to take it, yes.

"Q You thought you would get $300. or $400. out of it. Is that right?

"A That what I was told.

"Q You didn't want to fool with it, did you?

"A The way I look at it, I wouldn't hurt anybody for $300. or $400.

"Q And you wanted Mrs. Adams, Anna Lee Adams, to have it at that time, didn't you?

"A Yes, at that time because all I knowed was my part—

"Q And when the jury awarded $33,000. you changed your mind, didn't you?

"A No, after I found out how she done us, I changed my mind."

\* \* \* \* \* \*

"Q Have you discussed this with anyone involved in this lawsuit? That is, Mr. McGill there, sitting over there, had he talked to you about this prior to the time you signed the deed?

"A I don't remember.

"Q Have you discussed with any of these people here after Arvil Adams died about his estate prior to the time you signed this deed?

"A Yes, I told my sister what my uncle told me it was for, and I said I wouldn't do Anna Lee that way for $300. or $400.

"Q Who did you discuss it with?

"A I told my sister later on."

Ralph McGill testified he lived in Toledo, Ohio. He was visiting his sister, Mrs. Hampton, at the time he signed the deed. He was told by the Defendant and Leonard Adams the deed was for cemetery lots. He didn't read the deed, he just glanced through it. On cross-examination he testified:

"Q Wasn't it related to you that all you were going to get out of the estate was $300. or $400.?

"A My sister called me in Toledo.

"Q When was this?

"A I don't know.

"Q Prior to the execution of this deed?

"A This was before the deed was signed.

"Q Before this was signed?

"A Yes.

"Q But you knew you were going to get $300. or $400. out of the estate was

what you were talking about. Is that right?

"A But I figured we would sign this later."

* * * * * *

"Q When was the first time you were requested or knew anything about the execution of this deed? Was it before you went to your sister's on the date of execution?

"A I think I was in Ohio at the time.

"Q Who called you?

"A My sister.

"Q What did she say to you?

"MR. BRADFIELD: I object to what she said, your Honor.

"THE COURT: She's a party.

"Mr. Ogle:

"Q What did she say to you?

"A We talked.

"Q You're talking about Doris Inman?

"A No, I'm talking about Ima Lee.

"Q What did she say to you?

"A Something about she was going down, and was I coming down Christmas. I said yes. She said Uncle Leonard said there was some property which we would be entitled to maybe $200. or $300. after everything. Was I willing to mess around with it. I said no not particularly.

"Q Were you advised that the State was taking some property?

"A Really, I don't remember or recall it.

"Q You never talked to Leonard Adams, did you, about this?

"A When?

"Q Before the execution?

"A No.

"Q Did she ask you when you were coming down?

"A She wanted to know if I was coming down Christmas.

"Q Was anything said about signing a deed at that time?

"A They said something about sending one. I never did receive one in the mail."

Robert E. McGill did not sign the deed at the time the other three Plaintiffs did. It appears he signed it some time later. He and the Defendant arranged a meeting at a drive-in restaurant for his signing. He testified he did not read the deed prior to signing it. He said the Defendant told him she needed him to sign it because the state was taking some of the property at $50 per acre. He said he was not paid anything for signing. The Defendant did not tell him it was for cemetery lots.

Mr. Leonard Adams testified in behalf of the Defendant. He said he talked to the Plaintiffs prior to their signing the deed. When asked what he told them, he said:

"A I told them, I tried to explain to them the best I knew how that Arvil being deceased, and I told them they didn't have to sign it. I told them they were all minor heirs but my sister, makes you minor heirs with her deceased, and I said you can hold out if you want to, the best I remember, you have your share which would be a little. When you sign it, though, you're signing your rights away. That's what I told them the best I remember."

He denied he ever told any of the Plaintiffs they were signing a deed for cemetery lots. He also testified he was present at Mrs. Hampton's home when the three Plaintiffs signed the deed and he never heard the Defendant represent to any of them the deed was for cemetery lots. He understood the Plaintiffs were signing a deed for their interest in the farm.

Betty Rose testified she was present at the home of Mrs. Hampton on the occasion the three Plaintiffs executed the deed. She is a notary public and went there for the purpose of taking their acknowledgments. She said there was no mention of cemetery lots by anyone. She didn't know whether or not the Plaintiffs read the deed but they had an opportunity to do so had they desired.

The Defendant testified she never paid the Plaintiffs anything for signing the deed. Nothing was asked and nothing was promised. The Plaintiffs did not read the deed prior to signing it. She never represented to the Plaintiffs the deed was for cemetery lots. When asked what she told the Plaintiffs, she testified as follows:

"Q When did you talk to them?

"A I didn't talk to them at first. I presented the situation to the brothers. Leonard was elected. He knew them better. Some of them, I didn't know at the time. I asked him to talk to them and ask them if they would help me, and he explained the situation to them. I had no conversation telling them about the land.

"Q What did you tell them?

"A I asked him to sign because he told me they would.

"Q You never discussed what it was or anything. Is that right?

"A I never discussed anything except it was the deed to the land.

"Q Did you ever represent to them they were just signing away the graveyard lots?

"A No, because the graveyard lots are immaterial.

"Q They are contained in this deed?

"A Yes, I asked you, because Arvil owned the lots, should they go on that deed, and you said yes."

We shall consider in order the reasons advanced by the Chancellor for setting the deed aside insofar as the farm land is concerned. We shall first determine whether or not there was sufficient consideration to pass title.

■ There seems to be no real dispute but what all of the Plaintiffs knew they were executing a deed. Three of them say they thought the deed was for a cemetery lot only; one said he executed the deed because he was told the state was trying to take part of the land for $50 an acre. None of them demanded money for their deed and none was offered. However, something motivated them to sign the deed. The deed recites the consideration to be "One Dollar and other good and valuable consideration." It has been the rule in this jurisdiction for many years that a deed without consideration, but which is sufficient in form and recites a valuable consideration, passes title in the absence of fraud or the intervention of the rights of third parties. *Battle v. Claiborne,* (1915) 133 Tenn. 286, 180 S.W. 584.

In the case of *Davidson County v. Beauchesne,* (1959) 39 Tenn.App. 90, 281 S.W.2d 266, the plaintiff challenged the consideration recited in the deed, saying the consideration was for other property not included in the deed. There, 281 S.W.2d at page 269, the court said:

"We think plaintiff was estopped by her deed to maintain this suit or to deny the above recital. Estoppels are three kinds: (1) by record, (2) by deed, and (3) by matter in pais. 'Estoppel by deed is a bar which precludes one party to a deed and his privies from asserting as against the other party and his privies any right or title in derogation of the deed or from denying the truth of any material facts asserted in it.' 19 Am.Jur., Estoppel, sec. 6, p. 603.

" ' "A fact admitted by recital, or directly in a covenant or deed, concludes all the parties to it, and cannot be averred against." *Henderson v. Overton,* 10 Tenn. 394–397, 24 Am.Dec., 492.' *Battle v. Claiborne,* 133 Tenn. 286, 302, 180 S.W. 584, 588.

" ' "Estoppel by warranty is based on the fundamental principles of giving effect to the manifest intention of the grantor, appearing on the deed, as to the lands or estate to be conveyed, and of preventing the grantor's derogating from or destroying his own grant by any subsequent act." *Condit v. Bigalow,* 64 N.J.Eq. 504 (513), 54 A. 160.' *Battle v. Claiborne, supra,* 133 Tenn. 303, 180 S.W. 588."

■ The fact that the Plaintiffs failed to read the deed when they had an opportuni-

ty to do so cannot be relied upon as grounds for setting it aside. "The mere fact of the failure on the part of a grantor to read over a deed or to have it read to him before signing it is not, in the absence of any fraud or fraudulent representations as to its consequences, a ground for setting it aside." 23 Am.Jur.2d, Deeds § 136.

In this jurisdiction our courts have not had occasion to address the question of failure to read a deed but our courts have, on many occasions, held that one will not be heard to say he failed to read a contract as a defense to its enforcement. In the case of *Baker v. Baker,* 24 Tenn.App. 220, 235, 142 S.W.2d 737, 746, the court said:

> "In so far as the complainant's case proceeds upon the theory that she did not read the contract and was unaware of its contents, we think, under the evidence as developed so far, she must fail. If she did not read it she had a full opportunity to do so and there is nothing in the record to indicate that there was any advantage taken of her in connection with its actual execution. Hence she could not be heard to say that she did not know the contents of it. The case of *Spurlock v. Brown,* supra, as well as numerous others unnecessary to cite, rule this point against her under the evidence in the record before us."

Again, in the case of *Hardin v. Combined Insurance Co. of America,* (Tenn.App.1975) 528 S.W.2d 31, the court, at page 37, quoted with approval as follows:

> " 'To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.' 12 Am. Jur., 629. 'In this connection it has been said that one is under a duty to learn the contents of a written contract before he signs it, and that if, without being the victim of fraud, he fails to read the contract or otherwise to learn its contents, he signs the same at his peril, and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence.' 17 C.J.S., Contracts, § 137, pages 489, 490."

■ This brings us to consideration of the finding by the Chancellor that a fiduciary relationship existed between the Defendant and the Plaintiffs. The holding by the Chancellor is predicated entirely on the fact that the Defendant had qualified as administratrix of her husband's estate after his death. It is the insistance of the Defendant that, since the transaction here involved real estate and an administrator has no jurisdiction over real estate, no fiduciary relationship existed.

In addressing the authority of an administrator over real estate, Pritchard on Wills, 3d Ed., page 93, § 605, says:

> "But no interest in or power over the real estate of the decedent is conferred upon the personal representative by the common law or our statutes. Independently of a power given in the will, the executor or administrator can not manage or dispose of realty. He may, by statute, execute a conveyance of real estate pursuant to a written contract to convey made by the testator or intestate in his lifetime, but if the representative assume to sell and convey lands, his conveyance is a nullity, and the notes executed to him for the purchase-money are without consideration and will be cancelled and set aside in a court of equity. He has no power to abandon a contract made by the decedent for the purchase of realty, though the estate be equitable merely, and the title doubtful; whatever the title may be, it passes to the heirs, and not to the personal representative, and his acts in relation thereto are inoperative as to them. And so, an executor without a power in the will, has no such interest in land as entitles him to notice of the removal of a partition fence, and notice to him is not binding on the heirs. He cannot even make a contract which will bind the estate for the repair of a building on the land. In short, the executor or administrator has nothing to do,

*virtute officii,* with the lands of the decedent, except to subject it, in case of the insolvency of the personalty, in the mode prescribed by statute, to the satisfaction of the decedent's debts.

"Real estate can only be made liable in case the personal estate is insufficient to pay the debts; and if the heir has aliened it to an innocent purchaser, without notice of debts due by the ancestor, it cannot be reached, but the creditor's remedy is against the heir for the value of the land."

In the case of *Fulton, et al. v. Davidson, et al.,* 50 Tenn. 614, it is held that an executor who sold land by order of the court was acting in a "double capacity" as executor in regard to personal property and as trustee in regard to the proceeds from the sale of real estate. The court further held he was liable on his bond as to personal property but not as to the proceeds from real estate. He was personally liable for the funds from the sale of the real estate.

We cannot agree with the Chancellor that a fiduciary relationship existed between the Plaintiffs and Defendant but, even if it did, there was no relation between the duties the Defendant owed as administratrix and the execution of the deed, nor is there any showing of a breach of that confidential relationship by the Defendant.

In the case of *Robinson v. Robinson,* (Tenn.App.1974) 517 S.W.2d 202, the court said:

"It is not the confidential relationship between the parties that our courts are concerned with, but the abuse of that relationship. This point is made clear in the case of *Turner v. Leathers,* 191 Tenn. 292, 232 S.W.2d 269, where the court said: 'It is not a question of whether he knew what he intended to do, but how this intention was produced, whether it was by abuse of a confidential relationship or a fiduciary relationship.'"

The Chancellor also pointed out in his memorandum opinion that the Plaintiffs did not have the benefit of independent advice. In *Robinson v. Robinson, supra,* the court, in addressing the question of independent advice, said:

"While it is a well-established rule in certain cases involving undue influence that the donor must have the benefit of independent advice, we do not think it applies in the case at bar.

"In the case of *Turner v. Leathers, supra,* (191 Tenn. 292, 232 S.W.2d 269) the court said:

"'Under the circumstances *presented in this cause,* on account of the age, physical and *mental deterioration* of the donor, and where he is under the *unquestioned "dominion and control"* of the donee, it is necessary that he have competent, independent advice, free from the influence of the donee, in order for the gift to stand.'

(Emphasis ours.)"

In the case at bar we do not think the doctrine of independent advice is applicable. The Chancellor did not make a finding of fraud by the Defendant, nor do we find evidence to support such a finding.

We, accordingly, sustain the assignment of error as to the holding of the Chancellor that the deed was void as to the farm property. The decree of the Chancellor will be modified to this extent.

It is also noted that a mistake was made in both the memorandum opinion of the Chancellor and the decree in this case. It is there recited that the Defendant owned a ⅗ interest in the real property when it should have read she owned a ⅘ interest in the real estate.

To the extent the decree of the Chancellor is not modified, it is affirmed. The case is remanded for carrying out the provisions of the Chancellor's decree.

The costs of this appeal are taxed to the Appellees.

FRANKS, J., and WILLIAM I. DAVIS, Special Judge, concur.