**William M. WALSH, Successor Conservator for the Estate and Person of Nellie Bell Brown, Plaintiff/Appellee,**

v.

**Harry Richard BROWN, Defendant/Appellant.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Nov. 5, 1985.

Application for Permission to Appeal Denied by Supreme Court Dec. 23, 1985.

G. Patrick Arnoult of Watson, Arnoult & Quinn, Memphis, for plaintiff/appellee.

Larry H. Nance, Memphis, for defendant/appellant.

TOMLIN, Judge.

Defendant appeals from an adverse judgment rendered in the Chancery Court of Shelby County in an action brought by the conservator of the estate and person of Nellie Bell Brown, defendant's mother, seeking to recover for her estate certain *inter vivos* transfers of personal and real property allegedly made to defendant, her son, without consideration.

Following a bench trial, the chancellor found that a confidential relationship had existed between defendant and his mother and father, and that this relationship had been abused by defendant. He ordered certain items of property returned to the estate. Defendant consented to return some shares of corporate stock, an automobile, antiques, household furnishings and other personal items belonging to his parents. The chancellor also ordered defendant to repay his mother's conservator the sum of $3,090.57 which he had wrongfully withdrawn from his parents' bank accounts, and, in addition, ordered him to quit-claim back to his parents the interest he had formerly obtained by quit-claim from them in their home located at 5331 Stage Road, Shelby County, Tennessee. Two issues are presented by this appeal: (1) whether or not the evidence preponderates against the findings of the chancellor of the existence of a confidential relationship between defendant and the ward, and an abuse of that relationship by defendant; and (2) whether the chancellor erred in ordering the real estate herein involved reconveyed to the grantors when one of the grantors, defendant's father, was not a party to the litigation. For the reasons set forth below, we resolve these issues in favor of the conservator.

The original plaintiff, Barbara Jean Goodwin, a daughter of the ward, petitioned to be and was appointed conservator of the person and estate of Nellie Brown by the Probate Court of Shelby County in June, 1981. Prompted by a letter written to her by her mother and ward asking the conservator "to help get my home back," the conservator, by sworn petition, obtained authority from the probate court to bring this action. Subsequently, the present conservator was substituted by consent for the original one because of Mrs. Goodwin's ill health. Defendant Harry Brown is a half-brother of Mrs. Goodwin, being a son of the ward by her second husband.

This case was tried by the chancellor without the intervention of a jury. Accordingly, we review his findings on appeal *de novo* upon the record below, with a presumption of correctness of these findings, and, absent an error of law, we must affirm unless the evidence in the record preponderates against them. Tenn.R.App.P. 13(d).

A review of the record reveals that defendant, approximately 30 years old, was

employed by the Sheriff's Department of Shelby County as a deputy. Without being clothed with any legal authority, for almost 13 years he managed the financial affairs of his parents. For a large portion of that time he lived in their home on Stage Road. This was the home where he was raised as a young lad, and when we recite that he "lived in their home," we are also referring to a substantial part of his adult life.

Defendant's father, not a party to this litigation, had been in poor health for almost 25 years and had been cared for both physically and financially by defendant's mother, shown to have been an astute business woman in her day. The Browns Senior had two bank accounts, one checking and one savings, both of which show named defendant as a signator.

In 1980 and early 1981, Mrs. Brown's health began to fail. Both Mr. and Mrs. Brown required more care of an intensive nature. In late 1980 and early 1981, Mrs. Goodwin and defendant discussed on several occasions the necessity of placing the Browns in a nursing home. Mrs. Goodwin was of the opinion that the Browns' residence on Stage Road should be sold, with the funds escrowed for their future care. Defendant obviously was not of the same mind-set.

On or about the first of February, a Sunday, Mrs. Goodwin and defendant specifically discussed the disposition of the Browns' home for this purpose. On the following day, defendant obtained a quit-claim deed prepared by an attorney and caused it to be executed by the Browns, quit-claiming to him all of their right, title and interest in their residence. The following day, Tuesday, Mrs. Goodwin and defendant proceeded to look at nursing homes. At that time Mrs. Goodwin had no knowledge of the existence of the quit-claim deed. Later on that week defendant placed the Browns in a nursing home. At the time they were taken from their home by defendant, Georgia Austin, the ex-wife of Mrs. Brown's son by her first marriage (a full brother to Mrs. Goodwin), was present. She testified that Mrs. Brown

was crying profusely and that she strenuously objected to leaving her home. Although denied by defendant, Mrs. Austin, the former daughter-in-law, testified that defendant literally dragged Mrs. Brown out of the house and into the car. No proof was adduced concerning the attitude or demeanor of Mr. Brown. At the time that the Browns were placed in the nursing home, it was Mrs. Goodwin's understanding that it was done on a trial basis, and that they could return to their home any time they wished.

Sometime thereafter, Mrs. Goodwin learned of the quit-claim deed to her half-brother. Knowledge of this fact, coupled with other pertinent information, prompted her to begin proceedings which led to her appointment as conservator. A review of the Browns' bank records by the conservator and her attorney revealed that defendant had on many occasions paid personal debts out of his parents' accounts. All, or substantially all, of the funds in these accounts came from the Browns' social security checks, Mr. Brown's pension, and payments to Mrs. Brown on a promissory note given in connection with the sale of her interest in a business. The records showed that defendant withdrew $5,000 from the parties' savings account, depositing $2,000 of that amount in a credit union account in his name alone. The balance of $3,000 was spent by defendant for his personal use. The record also reveals that $4,300 was withdrawn from these two bank accounts and deposited by defendant in a credit union account in his name. Defendant later used these funds to purchase a motorcycle. There was no proof presented that either Mr. or Mrs. Brown knew of or authorized these withdrawals. Prior to the hearing below, defendant repaid the $4,300 to the conservator.

As for the quit-claim deed, there was a conflict in the testimony as to its history. Defendant testified that he felt certain that his parents had talked to the lawyer who drew the deed prior to its execution. However, the ward's guardian-ad-litem testified that he interviewed the attorney who draft-

ed the form deed, and that he was advised by that attorney that he was requested to prepare the deed by defendant, and that he had no conversations, either in person or by telephone, with Mr. and Mrs. Brown. By the same token, it was established that the notary public, an employee of the sheriff's department, took the acknowledgments of Mr. and Mrs. Brown, but, contrary to the form of the acknowledgment, did not see them execute the deed. Upon being confronted about the improper performance of this function, in an effort to protect herself, she obtained an affidavit signed by Mr. and Mrs. Brown, stating that they intended to and did voluntarily sign the "warranty deed" conveying the property to their son. On the stand this witness finally, although reluctantly, conceded that not only had she not seen the Browns execute the deed, but that she had no conversation with them concerning the instrument prior to its execution.

At about the same time that defendant caused the Browns' real estate to be quit-claimed to him, he also acquired from his parents corporate stock, two lots in New Mexico, a 1973 Cadillac, several antiques, and all the household furnishings in his parents' home in Shelby County. When asked at trial if he was holding these personal assets for his parents' benefit, his answer was in the negative.

The net result of the actions of defendant at the time that he obtained the quit-claim deed, and took possession and laid claim to his parents' personal property, was to completely denude them of all properties, except for their monthly social security benefits, his father's monthly pension, and the monthly payment of $389.66 being paid to his mother on a promissory note. Defendant testified that, at the time he entered his parents in the nursing home, he was fully aware of the fact that Medicaid would make no payments for their monthly upkeep if they had assets of any reasonable amount. Notwithstanding that his actions had completely denuded them of virtually all assets, defendant denied that he acquired all their property for that specific purpose. However, the guardian-ad-litem,

a member of the Shelby County Bar, testified that Tom Mitchell, the attorney who prepared the quit-claim deed, advised him during his investigation that defendant stated that his parents knew that if they owned property they would not qualify for Medicaid.

The record also reflects that since taking "title" to his parents' home in February, 1981, defendant had made monthly payments on the mortgage on the premises out of his parents' bank account. The record also reflects that defendant is a co-maker on the promissory note for which this mortgage was given, the note having been made sometime in 1977. On several occasions defendant contended that he had "records" to support his repeated assertions that he often made payments on his parents' behalf out of his own personal bank account, but that they were "at home" and he had not brought them to the trial.

Apparently because of their physical and mental conditions, neither Mr. nor Mrs. Brown testified at the trial below. Defendant contended that his parents were aware of what they were doing and intended to do what they did insofar as giving away all of their assets—to him. To the contrary, there was in evidence a poignant note in the shaky handwriting of Mrs. Brown, given to Mrs. Brown's sister and mailed to Mrs. Goodwin, of date July 18, 1981, stating: "Dear Daughter please get my home back for me. love ... your mother."

In this Court's opinion, the characterization of the action of defendant is best revealed in the following testimony of defendant himself when examined by plaintiff's counsel:

Q. Now, tell His Honor about the circumstances surrounding your obtainment of this quitclaim deed to the residence? How did you go about getting that?

A. The circumstances surrounding that were, my half sister and myself had had conversations pertaining to my mother and father going in a nursing home. It was her contention that the property

would be sold, that she wanted nothing to do with it, that she merely wanted the property sold and the monies put into an escrow account in my mother's and father's name.

. . . .

Q. All right. What was your contention?

A. My contention was that I had lived in the house since it was purchased, when I was approximately 11 or 12 years old. The house now is about 19 or 20 years old. Myself, I have lived there since I was 11 or 12 years old. It has been my parents concern that I have the house. It is stated in their Wills, that their parts of the house be willed to me, and that was—the house and the furnishings that I had grown up with. They were the furnishings that I had been around longer than I had been around the house, because we had the furnishings prior to moving into that house. And my contention was that it was my parents wishes that the property and the furniture be mine, and I was not going to be denied that.

While the will or wills of the Browns were not introduced into evidence, defendant testified that "the will states that I will receive mama's third of the property and I would receive daddy's third of the property and the other third of the property was already given to me by them." The "gift" of the other third was accomplished not by any deed or legal instrument, but by some type of a notebook—not introduced into evidence—wherein Mrs. Brown purportedly stated that she wanted defendant to have a third of the property. In so many words, defendant testified that he did not intend to be denied his inheritance.

■ Considering this record as a whole, we think the chancellor was quite justified in finding that a confidential relationship existed between defendant and his mother, and in finding as well that defendant had abused that relationship. In a case somewhat similar to the case at bar, that of *Turner v. Leathers*, 191 Tenn. 292, 232

S.W.2d 269 (1950), our Supreme Court stated:

" 'Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, *although the transaction could not have been impeached if no confidential relation had existed.*' " Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 3, § 956, p. 792.

This principle pervades the whole reach of confidential and fiduciary relations: trustee and cestui, Knox County v. Fourth & First Nat. Bank, 181 Tenn. 569, 182 S.W.2d 980, principal and agent, *McNeill v. Dodson-Bainbridge Realty Co.*, 184 Tenn. 99, 195 S.W.2d 626, attorney and client, parent and child, guardian and ward, physician and patient, nurse and invalid, confidential friend and adviser, and every relation which gives one person "dominion or influence" over another. [citing cases]

*Id.* at 271

While our Supreme Court in *Kelly v. Allen*, 558 S.W.2d 845 (Tenn.1977), declared that a relationship between a competent parent and an adult child is not a confidential relationship *per se*, we think there is more than ample evidence in this record to support the chancellor's finding that a confidential relationship existed between defendant and his parents, and that he abused that relationship as well. It is the abuse of this relationship by defendant that provides the basis for the conservator's claim. *Robinson v. Robinson*, 517 S.W.2d 202 (Tenn.App.), *cert. denied*, (1974). While the proof is limited as to the mental condition and capacity of defendant's parents, there is no question that they were in a weakened physical and mental condition at the time. As stated in *Turner v. Leathers, supra:*

It may be that the mentality of Mr. Leathers did not actually fall below the line defining the limits of legal mentality; that he still had mind enough to know what he was doing, or what he intended to do. It is not a question of whether he knew what he intended to do, but how this intention was produced, whether it was by abuse of a confidential and fiduciary relation.

*Id.* 232 S.W.2d at 271.

In addition, any presumption that might be brought into play as to the invalidity of these multiple transfers to defendant has not been rebutted by adequate proof of independent advice.

"[A] rule requiring proof of independent advice is ordinarily applied where it is a necessary requirement and where the circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice. *The rule is peculiarly applicable in gift cases, particularly where the effect of the gift is to impoverish the donor* ... In such cases proof of independent advice is frequently the only way in which the presumption of undue influence or unfairness can be rebutted, and in which it can be shown that the donor was acting independently and with full appreciation of what he was doing. (Emphasis added)"

Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 3, § 956b at 797–98, as quoted in *Richmond v. Christian*, 555 S.W.2d 105, 108, (Tenn.1977). There is no proof of independent advice in this record. While defendant testified that he thought his parents had talked to the lawyer who prepared the deed, there was testimony to the contrary quoting the lawyer himself.

We next consider the second issue presented to this Court, wherein it is asserted that the chancellor erred in rendering the decree when one of the grantors, Mr. Brown, was not before the court. Before disposing of this issue we feel constrained to comment on this aspect of the proceedings in this Court. It is clearly apparent from the record that at no time was Mr. Brown a party to the action brought by the conservator. This fact was also true at the time the chancellor entered his final decree. However, as brought out by the conservator in his motion to consider post-judgment facts, which was not controverted by appellant, some two months after the entry of the final decree below, defendant's father died. Appellant's brief was filed five months later. Notwithstanding the death of Mr. Brown, appellant presented this issue to the Court, without any mention of the fact of Mr. Brown's death. We are of the opinion that appellant and his counsel have been less than candid with this Court. We are also of the opinion that it was as much, if not more, the responsibility of appellant and his counsel to bring that fact to the attention of the Court as it was the appellee's.

At any rate, we are of the opinion that the death of Mr. Brown renders this issue moot. Prior to the conveyance of Mr. and Mrs. Brown's interests to defendant, they held title to the property as tenants by the entirety. Notwithstanding the quitclaim deed, Mr. Brown had an interest in this property as a result of the chancellor's ruling. Whatever interest he had passed to the conservator's ward upon his death. Therefore, a judicial determination that the conveyance from the Browns to defendant is void, and/or a decree ordering the reconveyance of defendant's interest to the conservator's ward will place the ward in the same position that she would have been in had the conveyance never been made in the first place.

Because of the death of Mr. Brown, duly brought to this Court's attention as a post-judgment fact and duly conceded by defendant, the decree of the chancellor is modified to the extent that defendant herein is ordered to convey all his right, title and interest in and to the property located at 5331 Stage Road, Memphis, Shelby County, Tennessee, to his mother, Nellie Brown. With said modification, the decree of the court below is in all matters affirmed. Costs in this cause are taxed to

defendant, for which execution may issue, if necessary.

CRAWFORD and HIGHERS, JJ., concur.