IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 27, 2002 Session

## FLOYD GABRIEL v. ANNA FAYE HUBBS, ET AL.

**Appeal from the Chancery Court for Union County**
**No. 3748     Billy Joe White, Chancellor**

**FILED DECEMBER 23, 2002**

**No. E2001-03102-COA-R3-CV**

---

This is a will contest. Floyd Gabriel ("the contestant") filed this action contesting the validity of the purported last will and testament of his grandfather, Floyd A. Harmon ("the decedent") on the grounds of incapacity and undue influence. Following a bench trial, the court below declared the will invalid. Anna Faye Hubbs ("Hubbs"), the decedent's caretaker and the primary beneficiary under the will, appeals, arguing that the trial court erred in finding that she exercised undue influence over the decedent. In the alternative, Hubbs argues that any presumption of undue influence arising out of her relationship with the decedent was overcome by the clear and convincing proof that the decedent received independent advice before executing his will. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and D. MICHAEL SWINEY, J., joined.

Craig J. Donaldson, Knoxville, Tennessee, for the appellant, Anna Faye Hubbs.

Michael L. DeBusk, Knoxville, Tennessee, for the appellee, Floyd Gabriel.

**OPINION**

I.

The decedent was married to Artie Harmon. Each had children from a previous marriage. On June 25, 1979, the decedent and his wife executed reciprocal wills, which bequeathed their respective estates to the other. The wills provided that if the testator's spouse did not survive the testator's death, the testator's estate would pass one-half to the children of the testator, in equal shares, and one-half to the spouse's children, again in equal shares.

In 1992, the decedent's wife was suffering from Alzheimer's disease and was a patient in a Maynardville nursing home. During her stay there, she came under the care of Hubbs, an employee of the nursing home. The decedent became unhappy with the care his wife was receiving and brought her home sometime in late 1992. Later, the caretaker who was caring for the decedent's wife at their home, decided the job was too much for her, so she contacted Hubbs to see if Hubbs would be interested in the position. Hubbs began working for the decedent in January, 1993. At that time, Hubbs' duties consisted primarily of caring for the decedent's wife, who was virtually bedridden; occasionally, however, Hubbs helped the decedent pay his bills by check.

In June, 1999, the decedent suffered a heart attack. When the decedent returned home from the hospital, Hubbs began caring for both the decedent and his wife. Following his heart attack, the decedent was physically ill and quite weak; whereas he had previously been able to assist Hubbs somewhat in the care of his wife, the decedent now was physically unable to do so. At least three witnesses testified at trial that the decedent's mental condition also began deteriorating around this time. Several witnesses testified that the decedent became increasingly fearful that he would die before his wife and that his primary concern was that his wife be properly cared for after he was gone.

The decedent and his wife reached the point where they both required around-the-clock care. Hubbs hired other individuals to assist her, including a woman by the name of Betty Sharp ("Sharp"). At trial, Sharp testified for the contestant. She stated that the decedent told her that Hubbs wanted the decedent to put his money in Hubbs' name so the decedent could be assured that his wife would be taken care of after he died. Sharp further testified that Hubbs asked Sharp to talk to the decedent on her behalf and to encourage him to put his money in Hubbs' name. Sharp stated that she, Sharp, talked to the decedent about the money "[j]ust about every night [she] worked" and that she told the decedent "[t]hat he needed ... to put the money in [Hubbs'] name so that [the decedent's wife] would be taken care of because the children wouldn't take care of her because that's what [Hubbs] had told me, and I believed it." Sharp also overheard Hubbs talking directly to the decedent, telling him "that time was running out, and he needed to do something with the money so that [his wife] would be taken care of."[1]

Several witnesses testified at trial that the decedent believed Hubbs had very little money. One of the decedent's distant relatives, who did not stand to inherit anything under the decedent's earlier will, testified as to the decedent's feelings toward Hubbs:

> He said he felt sorry for her, said that she had took him by her home, and he said ... it wasn't fit for a dog to live in and that he felt sorry for [Hubbs], that she didn't have nothing; said she had a hard time.

---

[1]Hubbs denies that she influenced the decedent to change his will. The trial court, however, did not find her testimony to be believable, choosing instead to believe Sharp.

Sharp testified that Hubbs did not want the decedent to know she operated her own nursing home, and Hubbs directed Sharp not to tell the decedent or his relatives about the nursing home. According to Sharp, Hubbs, in an effort to prevent the decedent from learning that Hubbs owned a new van, told the decedent it belonged to her neighbors. The contestant testified that when the decedent's wife died, he, the contestant, stayed at Hubbs' house. He described his reaction when he first saw the house:

A. I was kind of surprised actually to tell you the truth to drive up and see a nice house like that, and a Mustang sitting in a driveway for a son that hadn't even got his driver's license yet, a van sitting there, and another car sitting there.

Q. Why were you surprised?

A. Because I didn't actually – because I had an opinion of [Hubbs] as being someone that lived on a trail or up on a mountain somewhere.

Q. Why did you have that opinion?

A. That's the opinion I got from her and from [the decedent].

Q. All right. And that was untrue?

A. Yes.

Sometime after the decedent's heart attack, the decedent had Hubbs added to his bank signature card, authorizing Hubbs to sign checks drawn on his checking account. In July, 1999, Hubbs and Sharp took the decedent to the bank, where he proceeded to transfer $100,000 of his funds into certificates of deposit in Hubbs' name. These funds were previously in certificates over which he apparently had control; his grandchildren were the survivor beneficiaries of these earlier certificates. Sharp testified that the decedent told the bank employee who was assisting him that "these girls are wanting me to do something with my money." Sharp further stated that after they left the bank, the decedent said he wished he "had never bothered the money."

In August, 1999, the decedent met with bank officials to discuss changing his earlier will. The bank officials provided the decedent with the names of three attorneys. The decedent selected an attorney from that list. He then met with the attorney and explained that he wanted his wife to be properly cared for if he predeceased her and that he wanted any remaining money to go to Hubbs. The attorney then prepared a new will, as well as a special needs trust. The new will, executed on August 26, 1999, provided that if the decedent's wife survived him, his entire estate would pass into the special needs trust, executed the same date, for the benefit of his wife. In the event his wife predeceased him, the decedent's entire estate would go to Hubbs, who was named as a beneficiary

in both the will and the special needs trust. If Hubbs failed to survive the decedent, half of the estate was to be distributed equally among the decedent's issue and the other half was to be distributed in a like manner to his wife's issue. The decedent later told Sharp that he named Hubbs as the beneficiary because Sharp and Hubbs "had harped on him so much he was tired of hearing us harping."

The decedent died on September 29, 1999, and his wife passed away less than two months later, on November 19, 1999. The decedent was survived by two children, one of his children having predeceased him. That child left four children, one of whom was the contestant. The decedent's wife was survived by six children. Two of her children predeceased her, and those two children were survived by eight children. Together, the decedent and his wife had twenty direct heirs.

The contestant did not learn of the new will and trust until after the death of the decedent's wife. When the contestant confronted Hubbs about the change in beneficiaries, stating, "I don't understand why he did it this way," Hubbs said nothing.

In February, 2000, the contestant filed a petition for declaratory judgment, asking the court to rescind the 1999 will and trust and to issue an injunction to freeze the assets at issue in the case.[2] For grounds, the contestant alleged, as pertinent here, that Hubbs had exercised undue influence over the decedent and coerced him into changing his will.

At the conclusion of a bench trial, the trial court found that Hubbs had exercised undue influence over the decedent. This finding was based in large part on Sharp's testimony, which the court believed. The court further found that the independent advice the decedent received was not sufficient to overcome the presumption of undue influence. Accordingly, the court set aside the 1999 will and trust. From this judgment, Hubbs appeals.

II.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual determinations that we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Wright v. City of Knoxville***, 898 S.W.2d 177, 181 (Tenn.1995); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn.1993). The trial court's conclusions of law, however, are accorded no such presumption. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn.1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn.1993). We also note the well-settled principle that because the trial court is in the best position to assess the credibility of the witnesses, such determinations are entitled to great weight on appeal. ***Kellerman v. Food Lion, Inc.***, 929 S.W.2d 333, 335 (Tenn. 1996); ***Massengale v. Massengale***, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995).

---

[2]The contestant named as defendants the financial institutions with which the decedent had accounts, the trust administrator of one of the financial institutions, the other 19 issue of the decedent and his wife, and Hubbs. Hubbs is the only defendant to appeal the trial court's judgment.

III.

The contestant takes the position that the relationship between the decedent and Hubbs was such as to give rise to a presumption of undue influence. The general rule applicable in this case provides that

> [t]he existence of a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction.

*Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995); *see also* ***Childress v. Currie***, 74 S.W.3d 324, 328 (Tenn. 2002); ***Johnson v. Craycraft***, 914 S.W.2d 506, 510 (Tenn. Ct. App. 1995); ***Brown v. Weik***, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). A "confidential relationship" has been defined in general terms as "any relationship which gives one person dominion and control over another." ***Mitchell v. Smith***, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989); *see* ***Kelly v. Allen***, 558 S.W.2d 845, 848 (Tenn. 1977).

The burden of proof as to a confidential relationship rests with the party claiming the existence of such a relationship. ***Brown***, 725 S.W.2d at 945. As stated in ***Matlock***, once a confidential relationship is established in a situation where the dominant party "receives a benefit from the other party" – giving rise to a presumption of undue influence – the presumption can only be overcome by clear and convincing evidence that the transaction was fair. ***Id.*** at 386; *see also* ***Johnson***, 914 S.W.2d at 510. One way of proving fairness so as to rebut the presumption is to establish that the donor had the benefit of independent advice prior to the transaction. ***Richmond v. Christian***, 555 S.W.2d 105, 107-08 (Tenn. 1977); ***Bills v. Lindsay***, 909 S.W.2d 434, 440-41 (Tenn. Ct. App. 1993). The Supreme Court has described adequate independent advice as follows:

> [p]roper independent advice in this connection means that the donor had the preliminary benefit of conferring *fully and privately* upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefactions.

*Richmond*, 555 S.W.2d at 109 (quoting ***Turner v. Leathers***, 191 Tenn. 292, 297-98, 232 S.W.2d 269, 271 (Tenn. 1950)) (emphasis in ***Richmond***).

IV.

We begin our analysis by addressing the question of whether the trial court erred in finding undue influence based upon the confidential relationship between the decedent and Hubbs. Hubbs first argues that the evidence preponderates against the trial court's finding of a confidential relationship between Hubbs and the decedent. We disagree.

It is clear in this case that Hubbs had dominion and control over the decedent. *See Mitchell*, 779 S.W.2d at 389; *see also Kelly*, 558 S.W.2d at 848. The proof in the record establishes that, once the decedent returned home following his heart attack, he was completely dependent upon Hubbs and her assistants. Hubbs and her assistants had to provide around-the-clock care for the decedent and his wife. Sharp testified that the decedent could not walk without the aid of a walker, and that "towards the end he had to get in a wheelchair." He was no longer able to drive a car, and he depended upon Hubbs and Sharp to take him to the bank and to the doctor. The decedent also depended upon Hubbs and her assistants to provide meals for him. Because he was no longer able to pay his bills and sign his checks, the decedent had Hubbs added as an authorized signer on his checking account. It is very significant to note that the testimony of Sharp, the contestant, and another witness revealed that the decedent's mental condition also deteriorated after suffering the heart attack. Sharp recalled that the decedent would get up in the middle of the night and get fully dressed, thinking it was daytime. The contestant stated that the decedent spoke of conversations he had with the decedent's dead mother. Both the contestant and another witness spoke of the decedent often repeating himself and noticed that "his mind was getting bad."

Due to the decedent's weakened physical and mental state and his complete dependence upon Hubbs, Hubbs certainly had "dominion and control" over him. We therefore find that the evidence does not preponderate against the trial court's finding of a confidential relationship.

Hubbs next argues that "there in not even a scintilla of evidence in the record to support the finding of the [t]rial [c]ourt that the 1999 Will and Special Needs Trust should be set aside because of undue influence." We are perplexed by this statement, as the evidence in this case clearly establishes that the decedent's 1999 will and trust named Hubbs as a beneficiary and that, as such, Hubbs stood to inherit the decedent's entire estate upon the death of his wife. As the Supreme Court held in *Matlock*, "a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party," gives rise to a presumption of undue influence. *Id.* at 386. In a case which the trial court found to be strikingly similar to the instant case, we stated as follows:

> We believe that a will ... which leaves virtually all the [decedent]'s property to the person exercising dominion and control over him, and which disinherits others who would normally be considered natural recipients of his bounty, must be regarded with the utmost skepticism. Such skepticism is consistent with the rule which creates a presumption that the weaker party was the victim of undue influence

on the part of the dominant party, and that his will is therefore invalid.

*In re Estate of Neely*, No. M2000-01144-COA-R3-CV, 2001 Tenn. App. LEXIS 775, at *12 (Tenn. Ct. App. M.S., filed Oct. 22, 2001).

Furthermore, we note the trial court in the instant case made specific findings as to undue influence over and above the aforesaid presumption:

> And then we have this testimony by an employee of [Hubbs], Betty Sharp, that she was approached by [Hubbs] and asked to actively participate in undue influence we'll call it, that she and [Hubbs] on a daily basis exerted influence on this old gentleman along the line that your children, [your wife's] children, your relatives will not take care of [your wife], that [Hubbs] is the only person who will take care of her, and if you don't do something she won't be taken care of.
>
> Now, of course, [Hubbs] disputes that that took place, but that testimony is believed by the Court and found to be factual after hearing this lady testify – Betty Sharp testify. The Court has absolutely no reason to disbelieve her. She simply does not seem to have anything to gain or lose, and her testimony is corroborated by Mrs. Honeycutt who testified that during this period of time that she was approached [by Hubbs] to talk to the old gentleman about his business affairs and subsequently even asked [by Hubbs] if she had done so.
>
> So the Court believes that there was undue influence exerted, that he was convinced – that he was very fearful, that he was afraid. He came back out of the hospital, apparently knowing that he was going to die in a very short time, that he was emotionally distraught but this long history and fear of the nursing home – being told and knowing by – everybody knew that he was only going to live a very short time, and he came to realize that he was not going to out live [his wife], that he had a great desire to care for her, and there had been so much pressure put on him and influence exerted as to how to do that.

There was an abundance of evidence of actual undue influence on top of the presumption.

V.

We next address the issue of whether Hubbs overcame the presumption of undue influence and the direct evidence of such conduct by offering clear and convincing evidence of the fairness of the transaction based on independent advice. We hold that she did not.

As found by the trial court, the attorney and bank officers who provided advice to the decedent on the 1999 will and trust "did absolutely nothing wrong." The evidence in the record indicates that the attorney and the officers were "so disassociated from the interests of the [decedent] as to be in a position to advise with the [decedent] impartially and confidently as to the consequences to himself of his proposed benefactions." *Turner*, 191 Tenn. at 297-98, 232 S.W.2d at 271.

However, the question of whether a donor has had the benefit of the requisite independent advice necessarily turns on the facts of each case, and, obviously, the testimony of the witnesses. As we have noted, the trial court is in the best position to assess the credibility of the witnesses; thus, such determinations are accorded great deference. *Kellerman*, 929 S.W.2d at 335; *Massengale*, 915 S.W.2d at 819; *Brown*, 725 S.W.2d at 946. In the instant case, the trial court made an assessment of the credibility of various witnesses and determined that Sharp's testimony was to be believed. As previously noted, Sharp provided direct evidence of the undue influence Hubbs exerted over the decedent. Such direct evidence is a rarity in cases such as these. *See In re Estate of Maddox*, 60 S.W.3d 84, 88 (Tenn. Ct. App. 2001) (stating that "[w]hile undue influence may be proven either by direct or circumstantial evidence, direct evidence of undue influence is rarely available"). However, Sharp was one of the only persons who was aware of this undue influence, a fact that is of great import in this case. As the trial court stated:

> [The decedent] received independent advice, and the Court has absolutely no problem with the people who took care of that business.... [The attorney and the bank officers] were operating under what they thought to be the factual situation. They thought they were doing this man a favor. They thought they were trying to help him. They had absolutely no knowledge of what was going on at that home on a daily basis. The legal advice was good and in these independent advice cases where you're trying to overcome this presumption of a confidential relationship, good independent advice like this many times will overcome that presumption. But in this case there's so much influence being exerted at the time this was going on, and in his deteriorating condition, the Court holds that there's nothing morally or legally wrong with what these folks did, but it does not come up to the standards required of real independent advice that would not [*sic*] overcome this presumption of undue influence.

This court was faced with a similar situation involving independent advice in the case of *Ivey v. McAlexander*, No. 02A01-9210-CH-00287, 1993 Tenn. App. LEXIS 578 (Tenn. Ct. App. W.S.,

filed Sept. 1, 1993). In that case, the decedent's son was found to have unduly influenced the decedent to deed certain real estate to him and his wife. *Id.* at \*5-\*6. The decedent had previously intended the real estate to be divided equally between the son and his siblings. *Id.* at \*6. In determining that the independent advice the decedent received before altering the deeds was insufficient to overcome the presumption of undue influence, this court stated as follows:

> While there is evidence that the attorney who prepared the deeds discussed [the decedent's] actions with her, [the attorney] conceded that he was unaware of the examples of [the son's] domination and control over [the decedent] as was presented to the trial court by other witnesses. We do not find the evidence to preponderate against the chancellor's findings that, due to her weakness of mind and body, [the decedent] lost the will to fight and would rather agree and keep the peace than to create controversy.

*Id.* at \*17-\*18. *See also* **Turner**, 191 Tenn. at 297, 232 S.W.2d at 271 (holding that, with respect to an independent advisor's belief that the decedent knew what he was doing in transferring certain real property, "[i]t is not a question of whether he knew what he intended to do, but how this intention was produced, whether it was by abuse of a confidential and fiduciary relation").

Based upon this case law, we cannot say that the evidence preponderates against the trial court's findings that the independent advice was insufficient to overcome the presumption of undue influence and the direct evidence of such undue influence. Therefore, we will not disturb the trial court's ruling.

VI.

The judgment of the trial court is affirmed. This case is remanded to the trial court for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Anna Faye Hubbs.

_____
CHARLES D. SUSANO, JR., JUDGE