# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
December 11, 2015 Session

## IN RE: ESTATE OF TERRY PAUL DAVIS

**Appeal from the General Sessions Court for Blount County Probate Division**
**No. P-00695     Michael A. Gallegos, Judge**

_____

### No. E2015-00826-COA-R3-CV-MARCH 14, 2016

_____

Christinia Davis ("Wife"), Terran Denise Davis ("Terran")[1], and Taylor Ann Davis ("Taylor") appeal the April 17, 2015 order of the General Sessions Court for Bount County Probate Division ("Probate Court") upholding the Last Will and Testament of Terry Paul Davis ("the Will"). Wife, Terran, and Taylor raise an issue regarding whether the Probate Court erred in finding that the presumption of undue influence arising out of the proven confidential relationship between Terry Paul Davis ("Deceased") and Olive K. Davis ("Davis") was rebutted by clear and convincing evidence. We find and hold that although a confidential relationship was proven between Deceased and Davis, clear and convincing evidence was proven to rebut the presumption of undue influence. We, therefore, affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, CHIEF JUDGE, delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and JOHN W. MCCLARTY, JJ., joined.

Kevin W. Shepherd and D. Chris Poulopoulos, Maryville, Tennessee, for the appellants, Christina Davis, Terran Denise Davis, and Taylor Ann Davis.

Robert N. Goddard, Maryville, Tennessee, for the appellee, Dan Tussey, Personal Representative of the Estate of Terry Paul Davis.

Duncan V. Crawford, Maryville, Tennessee, for the appellees, Olive K. Davis, Larry Alan Davis, Lisa Davis, Gena Tussey, and Dan Tussey.

_____

[1] For ease of reading only, we refer in this Opinion to Deceased's daughters by their first names with no disrespect intended.

# OPINION

## Background

Deceased died on October 19, 2013. Deceased was a resident of Blount County, Tennessee at the time of his death, and was survived by his Wife and his two adult daughters, Terran and Taylor. Deceased was diagnosed with cancer in June 2013. He underwent surgery on June 28, 2013, and remained in the hospital until July 12, 2013. Upon his release from the hospital, instead of returning to the marital home he had shared with Wife and his daughters, Deceased moved in with his father and his mother, Davis. Deceased filed a complaint for divorce from Wife on August 19, 2013, but died before a divorce could be granted. Deceased lived with Davis until his death on October 19, 2013.

On August 6, 2013, Deceased executed the Will. In pertinent part, the Will attempted to disinherit Wife, Terran, and Taylor, and instead provided for all of Deceased's property to be equally divided among the following five other relatives: Olive K. Davis, Larry Allan Davis, Lisa Davis, Gena Tussey, and Dan Tussey ("the Beneficiaries"). In December of 2013, Wife, Terran, and Taylor filed a complaint to contest the Will alleging, among other things, that the Will was procured by undue influence. The case proceeded to trial without a jury in March and April of 2015.

Terran testified at trial that 2013 was a "[c]omplicated" year for her health-wise. She explained: "Even before 2013 I had been sick on and off. I suffer from SLE, systemic lupus erythematosus. It's a blood disorder and a full-body disorder." Terran was diagnosed with SLE when she was 12 years old, and the disease had caused both of her kidneys to fail by the end of 2012. When asked about further medical complications, Terran stated:

> Yes. When the failure set in from my kidneys, I had fluid overload. I gained about forty-five to fifty pounds, and the fluid backup, it surrounded my heart and caused it to stop. I had a heart attack at twenty-one, and when they brought me back my heart was functioning less than two percent.

Terran testified that before Deceased was diagnosed with cancer, she was engaged in hemodialysis, a form of dialysis in which the patient's blood is cleaned through a machine. This treatment left her in a poor condition. She stated that Deceased strongly indicated that he wanted to be tested to see if he could be a potential donor to give Terran one of his kidneys. Testing revealed that Deceased was a very close match, but that Deceased was diagnosed with pancreatic cancer shortly after undergoing the testing. Terran neither hated nor resented her father for being unable to donate his kidney to her.

2

Terran testified that she and Deceased had a close relationship and that they were drinking buddies who enjoyed "[f]ootball every fall." When asked to describe her relationship with Deceased prior to his diagnosis, she stated:

> He wouldn't leave me alone. He was always by my side. Every chance he got, like he would play with my feet because that was the only part that wasn't swollen anymore or painful. So instead of hugging me, because he knew that I would bruise, or patting me on the head, because I was bald and had no support up here (indicating), he would grab my foot and kind of shake it. That was his way of saying, I'm here.

Terran testified that she and Deceased both were hospitalized in July of 2013. When asked whether she was in a condition to visit Deceased in the hospital during this time, Terran stated: "No, I had an infection and it was a serious one. I was running around with a mask constantly." According to Terran, Deceased was not in a position to visit her either. Terran told her mother to visit Deceased, and her mother did visit Deceased before visiting Terran.

According to Terran, she was not in a position to visit Deceased upon her release from the hospital. When asked to explain, she stated: "Someone had to take me. I couldn't drive. I was on mandatory bed rest. I cheated. I wanted to go see [Deceased], so I waited until [Wife] was off work. She drove by the house, still in work clothes, picked me up, drove up to Fort Sanders." Terran stated that she visited her father against medical advice.

When asked whether there had been any indication before Deceased was released from the hospital that he would be moving out of their home, Terran answered: "No. His favorite phrase every time I saw him was, are you keeping my La-Z-Boy warm for me."

Terran was questioned about when Deceased came to the marital home on August 5, 2013. Her grandfather, Deceased's father-in-law, brought Deceased to the house so that Deceased could collect some papers that he needed. Deceased had trouble walking at that time. She and Deceased reminisced about the past. Terran's sister, Taylor, did not react well to Deceased being in the house. She explained:

> My sister came down and saw him and kind of freaked out a little bit. He's like, hey, tater bug, he calls her. She's like, yeah, hi. She's stepping back from him. And he's like he wanted a hug and she's, no. What's wrong, tater bug, don't you know me? Not anymore. Ran up the stairs and hear a

door slam and she's locked herself in her room.

When asked what she and Deceased did at that point, Terran answered: "Things got awkward. He was holding the papers and he was just kind of shuffling around. He - - he didn't act like himself. He just wasn't Dad anymore. I don't know how to describe it. I really don't." Deceased told her that he was coming home when he got stronger and that he loved his girls and was going to take care of them.

Terran was readmitted to the hospital later in July in order to have a PD tube installed so that she could undergo a different type of dialysis. At the time of trial, Terran still was on dialysis. Terran stated that she was not aware that Deceased was hospitalized a second time until after she returned home from the hospital. Neither Deceased nor Davis visited Terran when she was hospitalized in July.

Terran did not have a very good relationship with her grandmother, Davis. When asked whether she recalled that Davis encouraged her to attempt to obtain Social Security benefits and offered to drive her to the Social Security Office, Terran stated: "That did not occur."

Terran testified that she visited Deceased five times while he was staying at Davis's house. She stated that she tried to visit Deceased as much as possible, but Davis interfered with her ability to visit. When asked how Davis interfered, Terran explained: "She would come up with reasons, that he needed rest or it was time for his nurse to take care of him or he needed to do this and she needed to do that for him and that it was time for me to leave." Terran later admitted, however, that she could have seen Deceased as much as she wanted, and that her grandparents did not prevent her from visiting. Terran admitted that Davis and Davis's husband even offered her one hundred dollars a week to stay with them and care for Deceased. Terran did not want to do that. She stated that she was not in a physical condition to help take care of Deceased, and she explained:

> I wasn't even a hundred pounds and I had just gotten out of surgery. I was doing hemodialysis four times a week and could barely move on my own. I was lucky I could shuffle from place to place by myself. And they wanted me to help take care of a man who was two hundred and fifty pounds and sick and could wobble on top of me at any moment?

When asked to clarify her testimony regarding her ability to visit Deceased, Terran stated that despite the fact that her grandparents offered to pay her to stay with them and that she got to visit Deceased, she still felt that her grandparents kept her from visiting.

Davis testified at trial that she was not aware of any time that Terran stayed

4

overnight in the hospital during the times when Deceased was hospitalized prior to October 2013. Davis stated that when Deceased was hospitalized in June, July, and August 2013, Terran was not hospitalized for any overnight stays during that period of time. When asked to clarify whether her testimony was just that she was not aware of it or that it did not happen, Davis stated: "It did not happen." Davis testified that "[w]e would have known if she would have been in the hospital overnight." When asked how she would have known, Davis explained: "Because we would have - - somebody would have told us." Davis testified: "She was not in the hospital overnight. She was in the hospital on the 7th or 8th of July to have her cord cleaned. It was one-day surgery." Davis testified that Terran was in the hospital in August for a port, but it was "one-day surgery." When asked, Davis answered that she did not know whether or not Terran had a tube coming out of her neck. Davis testified that Deceased visited Terran when she was in the hospital overnight in November 2012.

Davis testified that Deceased was diagnosed with cancer in June 2013. Deceased had surgery on June 28, 2013, and Davis explained:

> He was to have - - they were going in to see if they could get the little cancer, it wasn't but about that big (indicating), and they were going in to see - - they put a scope into his stomach to see. And then he was to have - - the doctor decided that he needed a partial Whipple, which is they removed of his stomach and so many feet of his intestine.

Deceased remained in the hospital until July 12, 2013. Upon his release from the hospital, Deceased moved into Davis's house and lived there until his death on October 19, 2013.

According to Davis, Deceased made the decision to move into her house after he was released from the hospital. When asked whether she encouraged or pressured Deceased into making this decision, Davis replied: "No, I did not." According to Davis, Deceased chose to go to her house rather than return to his marital home "[b]ecause he could not go where there were a bunch of cats." Davis also testified that Deceased knew that she had experience caring for other people and that he would get "twenty-four seven care with [her]."

Davis stated that Deceased required "[t]wenty-four hour, seven" care after he was discharged from the hospital. She explained that "[h]e had a drain tube out of his stomach that had to be monitored and emptied and recorded so that Dr. Midis could know what type of - - what - - how much fluid was coming out of his stomach." Davis explained that the drain tube had to be attended to "[e]very day . . . . [I]f it filled up, you know, more than normal [she] had to empty it and then record it and then close it up

5

again so it could fill up again." Deceased left the hospital with an infection and received antibiotics through a midline. Davis explained:

> It's a - - it's where that you can hook up IV's to it, and that was he had - - first, you had a midline; then they put a port line in it that went all the way up and in - - you know, and that had to be flushed each day, each morning, each night, and if I - - if I gave him the antibiotics, why, then, it was in a cylinder that they use in space that had to be specially this and brought to the house from Fort Sanders.

Davis drove Deceased to all of his doctor's appointments because Deceased "was not released to drive." When asked whether she performed the actual caretaking of Deceased, such as, feeding him, preparing meals for him, and providing all the food for him, Davis stated: "That's correct." When asked whether Deceased ever was able to leave her home without her being present, Davis stated: "Yes." She explained: "On July the 24th he called his father-in-law to come down and let him in [the marital home] because they had locked it up to where he could not even get in the house." Deceased needed to get into the house because "[h]e needed some paperwork, and he needed his payment book on his truck and things like that."

Davis made payments on Deceased's bills on his behalf. When asked whether Deceased was totally dependent on her both financially and physically, Davis stated: "In a sense yes because he did not have any money in his checking account or in his savings account." When asked whether Deceased depended on her to take care of him, Davis testified: "He was basically - - yes, he was, because he asked if I would pay the bills and then when he got well he would reimburse me."

Deceased appointed Davis as his healthcare agent shortly after he was discharged from the hospital. She stated that the Appointment of Health Care Agent form was prepared by Tammy Widener, a patient advocate at Fort Sanders Hospital. When asked whether Ms. Widener had conversations and consultations with Deceased before he executed the Appointment of Healthcare Agent form, Davis answered: "Yes." Davis was not present during those conversations and consultations.

Davis testified that she prepared a Durable Power of Attorney, at the request of Deceased, which appointed her as his agent. Davis used a Durable Power of Attorney that had been prepared for her brother-in-law as a guide. On August 2, 2013, Davis took Deceased to Tennessee Farm Bureau where the Durable Power of Attorney was signed and notarized. According to Davis, she did not exercise any of her powers under Deceased's Power of Attorney until after the Will was executed.

6

Davis testified that her husband, Deceased's father, made the appointment for August 5, 2013 for Deceased's initial consultation with Attorney Martha Meares. Davis drove Deceased to that appointment. When asked whether the appointment was for an initial consultation about obtaining a divorce, Davis answered: "As far as I know, yes." Davis later testified, however, that she did not know what the appointment was for or whether it was to discuss a divorce or something else. Davis did not know Attorney Meares before Deceased's initial appointment and had never used her services before.

The meeting with Attorney Meares was at Attorney Meares's law firm, Meares & Dillard. Davis thought that she remained in the room during the conference. Davis was sitting at the same table as Deceased and Attorney Meares, but she did not hear all of their conversation. When asked why she felt it was necessary to sit in the room with Deceased while he met with his attorney, Davis stated: "I don't remember." Davis could not recall anyone else being with her at the time.

According to Davis, Deceased had not mentioned anything to her about making a Will. When asked whether she heard any mention of a Will during the discussion in Attorney Meares's office, Davis answered: "Yes, there was - - Ms. Meares requested - - you know, said there was certain things that you had to do before that you could file a divorce and one was a Will." Davis did not overhear any discussion between Deceased and Attorney Meares about the contents of the Will. Davis drove Deceased home after his meeting with Attorney Meares, and Deceased did not mention anything to her about a Will either in the car or at home. Davis only knew that Deceased had to return to Attorney Meares's office the next day "[b]ecause it was mentioned that he had to return the next day."

Deceased executed the Will on August 6, 2013, the day after his initial consultation with Attorney Meares. Davis testified that no one else accompanied them to Attorney Meares's office on that visit. When asked whether she sat in the room with Deceased while he executed the Will, Davis answered: "I was in the office part where you first come in." When asked to clarify whether or not she was in the room when Deceased executed the Will, Davis explained: "No, I was not in there when they did it." Davis stated she was in "[Attorney Meares's] lobby" when Deceased executed the Will, and that Deceased had gone into the conference room without her. Davis was not present when Attorney Leith Marsh talked to Deceased about the Will on that day or when he signed it.

Davis agreed that she had been present during the initial consultation and was sitting at the same table when Deceased talked to Attorney Meares and expressed his wishes. When asked to clarify whether the discussion about Deceased's wishes concerned the Will or a divorce, Davis answered: "I don't know. I don't remember

7

which one." Davis stated that she had no knowledge of the contents of Deceased's Will until after his death.

Davis took Deceased to Attorney Meares's office to sign the complaint for divorce, but stated that she did not see a copy of the divorce complaint at that time. When asked whether she paid Attorney Meares for a divorce retainer and for preparing the Will, Davis answered: "That's correct. [Deceased] asked if I would loan him the money." Davis wrote a check payable to Attorney Meares for $3,750.

According to Davis, Attorney Meares suggested that Deceased change his life insurance beneficiaries before filing for divorce. Davis stated, "she indicated that if he had any life insurance policies they needed - - the beneficiaries needed to be changed before the divorce was filed." Deceased made the initial calls to the insurance companies to inquire about changing life insurance beneficiaries before he filed for divorce.

Davis and Deceased went to Tennessee Farm Bureau on August 6, 2013. When asked whether she signed a change of beneficiary request form at that time, she replied: "That is correct." Davis testified that after finding out that Tennessee Farm Bureau would not allow her to sign as Deceased's Power of Attorney, she took Deceased back to Tennessee Farm Bureau on August 8, 2013. Davis stated that the Tennessee Farm Bureau agent came out to the car. When asked whether that was because Deceased was feeling weak that day, Davis stated: "He - - we - - he had been to the doctor, to his - - Dr. Midis that morning. And as we came back from Knoxville we went by the Farm Bureau's office." The Tennessee Farm Bureau life insurance policy was for $110,000, and Davis was named as the beneficiary after the change.

After Deceased's death, Davis received benefits from several life insurance companies where Deceased had policies. Davis received $187,527.04 from a life insurance policy with American General Life Insurance. Davis testified that the beneficiary on the policy was changed after the Power of Attorney was executed, but she stated: "That was [Deceased] was the one that changed - - that changed that." When asked whether she had to send in the Power of Attorney for the beneficiary change, Davis stated: "I don't remember whether I did or not." Davis did not remember the date the policy was changed, but it was before Deceased filed for divorce.

Davis received $23,000 from American Income Life Insurance in December 2013. Gena Tussey, Dan Tussey, Larry Davis, and Lisa Davis received benefits under that policy as well. When asked whether the life insurance beneficiary was changed after the Power of Attorney was executed, Davis stated: "Yes, it was after, but [Deceased] was the one that - - that called the companies, he's the one that got the paperwork, he is the one that signed it." Davis stated: "He did all the signing, period, except the one at the Farm

8

Bureau, and he - - I said, [Deceased], you need to sign this. And he said, Mama, sign it. And I says, [Deceased], I can't sign it. He said, Mama, I said to sign it."

Davis received $40,000 from another life insurance policy with Central States Southeast and Southwest Area Health and Welfare Fund. When asked whether Wife had been listed as Deceased's beneficiary on his life insurance policies before the Power of Attorney was executed, Davis answered: "I guess that's correct."

Attorney Martha Meares testified. Attorney Meares had been a practicing attorney since 1971. She first met Deceased on August 5, 2013, after he had been released recently from the hospital. Deceased "didn't look well," and he told her that he was not well. She was unsure how long the first meeting lasted, but it was "a nice long meeting."

Attorney Meares was not certain who drove Deceased to the initial appointment but his mother was with him. Davis was present when Attorney Meares met with Deceased in the conference room. Attorney Meares explained:

> I know his mother was there because I remember where she was sitting. The conference room table was rectangular, and he and I sat at one corner with me here (indicating) and him here (indicating), and - - and I know that she was somewhere down at the other end of the table, and there may have been somebody else down there, too, and I - - I can't remember for sure - -

Attorney Meares testified that there were three or four chairs along the long sides of the conference room table. Davis was "maybe five to eight feet away" from Attorney Meares and Deceased. When asked whether the conference room was quiet, Attorney Meares answered: "I think the air conditioner was on."

When asked why Davis joined Deceased in the conference room, Attorney Meares explained:

> Well, when someone's coming in to see me, it is not uncommon for moral support to come along, for a family member to come. That's - - I'd say that happens more often than not when someone comes. Especially if they're considering getting divorced, they have some moral support there.

When asked whether Davis sat quiet the entire time, Attorney Meares responded:

> I don't have any memory of things that she might have said at all. When I'm doing an interview with a client or a potential client I'm pretty much

9

focused on them.  And he and I were sitting there like we were having a private conversation, but there were probably other people in the room.  And she may have chimed in from time to time.  I don't have any memory of anything particular that she said.

Attorney Meares agreed that sometimes "[t]he moral supporters who have a real agenda themselves" interject a lot, but she did not recall Davis behaving that way.  Attorney Meares stated that she and Deceased talked about a divorce, the Will, and insurance policies while Davis was in the room.  Attorney Meares did not remember whether Davis remained in the room the entire time.  When asked if she agreed that attorney/client privilege is compromised when there is someone else participating, Attorney Meares replied: "I would agree with that."

Attorney Meares testified that she and Deceased "talked about everything" in the initial appointment, and that Deceased mentioned both a divorce and a will early on in the conversation.  When asked whether Deceased came to see her for a divorce, Attorney Meares explained:

He came in - - well, he was just telling me what was happening to him and he was considering divorce.  He wanted to change his Will.  He wanted to - - he was very upset.  He was very angry with his wife.  He was very upset with his children.  And he just generally told me the predicament that he found himself in.

When asked whether Deceased indicated to her why he wanted a divorce, Attorney Meares replied that "he was very angry at his wife, and he had been in the hospital and he was upset that she hadn't visited him sufficiently and he was upset with his children that they had not visited him sufficiently and he was upset at the condition of the home."  When asked what Deceased said about the condition of the home, Attorney Meares stated:

He said that it was full of cats and that he - - he thought it was adversely affecting his physical condition and that she cared more about the cats than she cared about him, and that they were nasty.  And he - - he just described the conditions as not habitable by - - at least by him, that he couldn't stay there, especially in his - - with his physical condition.  And that there kept being more and more cats, and he may have told me the number, but it was a lot of cats, not just one or two.  And so he was angry about that.

He was angry about needing things.  At one point he talked to me, and I don't know if this was on the first day or not, but it may have - - may have

been, about the money being taken out of his account. He was upset about that. And it - - that may have been the first day. I don't know for sure. I talked to him on the phone after that several times.

Attorney Meares stated that Deceased "was upset about the money, [Wife] draining his account." Deceased told her about an incident that occurred when Deceased was in the hospital and Wife visited him after working at the Blount County Animal Center. Deceased told her that Wife got into his hospital bed in her work clothes, and Deceased "felt like she had done it on purpose to contaminate his bed with those cat hairs or the animal hair and everything . . . ." Deceased was very upset about that incident. According to Attorney Meares, Deceased blamed Wife when he was unable to retrieve some of his possessions from the marital home after he was released from the hospital.

The address Deceased listed as his address for the divorce complaint was the same as the one that he gave for Wife. When asked whether it appeared that Deceased and Wife still were living together, Attorney Meares stated: "Well, I remember that I think his parents lived at an address close by that address." She advised Deceased that, if he wanted to change any life insurance beneficiaries, he would need to do so before filing for divorce. Deceased signed the divorce complaint on August 9, 2013.

Attorney Meares testified that the first thing she usually does when a client wants a Will is talk with them about their wishes. When asked whether Deceased already had a Will, Attorney Meares responded: "I don't remember if he did. He wanted to make sure his - - his wishes were to make sure that his wife did not inherit anything from him. That was what he initially said to me . . . ." Attorney Meares stated that she did not tell Deceased that he could not disinherit his wife under Tennessee law, but she did "talk about dissent from a will."

Deceased raised the issue of disinheriting his children in the initial meeting, and Attorney Meares argued with him about it. When asked to describe the conversation, Attorney Meares responded:

Because the first of the conversation, the emphasis was on [Wife] and - - and the - - how unhappy he was with her behavior and how he - - it was damaging to him. And then he said he wanted - - when we started talking about the Will, he said he did not want to leave anything to his children at all. And I said, well, now, wait a second, you know, I said, sometimes when people are having - - when a husband and wife are having problems, it polarizes the children and they have to choose one side or the other, and I thought he would regret that. I wanted him to really think twice about doing that before he did it. And - - well, I wanted him to think twice about

11

it all but - - but that was something that was . . . .

Attorney Meares further stated:

> It kind of touched me, you know, that he wanted to write out the children and not have them included, and I really quizzed him about that and suggested that maybe he wouldn't want to do that, that - - was he sure about it? I wanted to make sure that it wasn't just in the heat of the moment while we were talking about her that he was lumping them with her. And I really wanted him to consider each child individually. And we not only talked about the children together, the girls, but we talked about them individually. I don't remember the particulars about each one but I remember I went over both . . . .

Deceased was very particular about what he wanted to do even after she tried to dissuade him from disinheriting his children. Attorney Meares explained:

> Well, I think he was firm in his decision. He - - he certainly - - I'm pretty persuasive, and he was not persuaded by me to change his mind about the - - the children. I didn't try to dissuade him about the wife but I did about the children, and I think he was - - was comfortable and relieved that he was getting this done.

Deceased told her about Terran's illness and his previous plan to donate a kidney to her. She stated:

> He had told me that he had been tested to give her a kidney. I think that may have been how he found out he was so sick, or part of it at any rate. But he had - -yeah, he - - he did tell me about her kidney problems and that he had been willing to become a donor for her before - - before this. So that was even more of the reason of why he felt so offended is because he had been willing to do that, and then I think he felt like they had abandoned him or hadn't treated him right. He was - - he was angry about his situation.

Attorney Meares did not remember whether or not Deceased ever mentioned that he and Terran were hospitalized at the same time.

When asked whether she made any observation that would lead her to believe that Deceased was being influenced, duly or unduly, by anyone to make the Will, Attorney Meares stated: "I didn't think he was. He - - he was the one telling me what to do. I

didn't see any influence by anyone else." Deceased was "assertive in his wishes" when discussing the Will. Attorney Meares could not remember whether or not Deceased or Davis told her that Davis held Power of Attorney for Deceased. Davis wrote her a check for $3,750 for her services. When asked whether she observed Deceased ask Davis what to do, Attorney Meares stated:

> Uh-uh, no. (Negative) No. Those - - those wishes that he made known to me that day were his and his only. And that's - - that's when I called - - after we had kind of resolved the - - that part he - - I called [Attorney Marsh] in and she took over.

Attorney E. Leith Marsh, another attorney at Meares & Dillard, prepared Deceased's Will. Attorney Marsh was not present when Attorney Meares first met with Deceased. When asked how Attorney Marsh obtained the information to prepare Deceased's Will, Attorney Meares explained:

> At some point during our meeting that day, I asked for [Attorney Marsh] to come into the room with us, and I introduced her to [Deceased]. And I talked about the - - his wishes and that he wanted a Will drafted and that he wanted his wife specifically excluded and that he wanted his children specifically excluded. And I asked her to then meet with him, continue a meeting with him, to get the specifics of any bequests that he wanted to make. And I think at some point I left [Deceased] with her and I left the room.

Attorney Marsh testified that she was brought into the meeting between Deceased and Attorney Meares when the subject of a Will arose. Attorney Marsh explained that Attorney Meares left the room at some point to allow Attorney Marsh to "get the specifics for the Will."

Davis was present when Attorney Marsh and Deceased went over the specifics for the Will. She also testified that she believed that Deceased's father was present as well. They all were sitting around the conference table. When asked to recall the placement of everybody at the table, Attorney Marsh explained:

> [Deceased] was at the seat closest to the door. And his parents were at the other end. And I was also - - I was right there next - - [Attorney Meares] was originally at the end of the conference table, and I was to her right in the - - directly across from [Deceased].

Attorney Marsh said that there could have been seats between Deceased and Davis, but

13

she was not sure exactly where Davis sat.

Attorney Marsh thought she had introduced herself to Deceased's parents. When asked whether she knew why Deceased's parents were present during the meeting, Attorney Marsh stated: "Well, I thought they had - - he was staying with them, he'd got out of the hospital, and I think they were his transportation." Attorney Marsh could not recall ever seeing Deceased drive, and she did not know whether he was able to drive or not. Attorney Marsh did not recall when Deceased had gotten out of the hospital in relation to the day of the initial appointment. When asked whether Deceased struggled or had any difficulties at the first meeting, Attorney Marsh responded: "We always met in the conference room because his mobility we were sensitive to. I think he had some type of walking aid, a cane or something."

Deceased told Attorney Marsh that he wanted to disinherit Wife and his children. She believed that the reasons he gave her for wanting to do so were the truth. She stated: "He told me that he was angry and upset that he hadn't been treated well by his wife or his children and specifically that they hadn't come to see him in the hospital, did things like that, and - - and that was why." Attorney Marsh heard some of the discussion regarding Deceased's Will during the initial consultation that Deceased had with Attorney Meares, and she stated:

> He was very specific that he did not want to leave anything to his wife or to his daughters. His wife, he was planning on divorcing. And his children, he felt, had taken her side not only in the marital relationship but also with regards to his illness. And that really - - those two things really struck a chord with him.

When asked whether she heard any attempt by Attorney Meares to change Deceased's mind about disinheriting his daughters, Attorney Marsh answered: "She cautioned him about that. You know, she has been doing this a long time and warned him that, you know, children frequently get yanked around in a divorce situation, even adult children, and do you really want to do that kind of thing." When asked how Deceased responded to Attorney Meares's counsel, Attorney Marsh explained: "He was very clear not only were they taking her side in the divorce but, you know, he was sick with cancer and they did not come see him, and that was - - that was very meaningful to him."

Attorney Marsh testified that she prepared the Will in accordance with Deceased's wishes. Attorney Marsh did not believe anyone was influencing Deceased's decisions. While Davis spoke about Deceased's cancer during the August 5th appointment, Davis did not voice her opinion as to what Deceased should put in the Will.

Attorney Marsh prepared the Will for Deceased, and he signed it the day after their first meeting. When asked whether Davis came to the meeting when the Will was executed, Attorney Marsh stated: "I think so. I - - I think she was his transportation." When asked to describe the process of Deceased's review of his Will before signing, Attorney Marsh explained: "I made sure he read every word and was there for any questions . . . ." Deceased reviewed the Will and he did not ask for any changes. Deceased said he wanted to sign the Will.

Lisa Vitale, who was a legal assistant and paralegal at Meares & Dillard in August 2013, testified at trial. Ms. Vitale stated that she had twenty-four years of experience as a legal assistant and paralegal. Ms. Vitale witnessed Deceased's Will. This was not the first Will she had witnessed.

Ms. Vitale thought that Deceased's parents drove him to Meares & Dillard to execute the Will. Davis remained in the waiting room and was not present when Deceased signed the Will. The Will was executed in a side conference room on the first floor of Meares & Dillard. Ms. Vitale was in the room along with Deceased, Jennifer Meares, who was the other witness, Lucy Sherrod, who was the notary, and Attorney Marsh, who prepared the Will, when the Will was executed.

Ms. Vitale did not review the Will with Deceased and was not present when anyone went over the details of the Will with him. Ms. Vitale stated, however, that Deceased had the opportunity to review the Will before he signed it. She could not recall whether she saw Deceased review every page of the Will.

Ms. Vitale noted that Deceased was "adamant" about wanting to sign the Will. Deceased signed the Will without any hesitation or reservation. Deceased signed the Will in her presence and the presence of the other witness, Jennifer Meares, and the notary. Ms. Vitale signed the Will in the presence of Deceased, Jennifer Meares, and the notary. Ms. Vitale signed the attestation clause and an affidavit.

Ms. Vitale knew Deceased had cancer. She could tell from Deceased's physical appearance that he was ill. When asked to describe how she could tell, Ms. Vitale explained: "His physical form. You know, the - - the - - the hair loss and just the - - the frailness of him. But he was - - he was pretty strong - - strong-minded and strong-willed, knowing what he wanted to do."

Ms. Vitale was not present during Deceased's initial consultation with Attorney Meares regarding his divorce. Ms. Vitale stated that she did not believe that she prepared the divorce complaint for Deceased, but she could not recall for certain.

15

Jennifer Meares testified that she had been employed at Meares & Dillard when she witnessed the Will. She witnessed one other Will during her employment at Meares & Dillard. The Will was executed in a conference room on the first floor at Meares & Dillard. Ms. Meares remembered Deceased, Attorney Marsh, Lucy Sherrod, and Lisa Vitale being the only people in the room besides herself at the time of the execution. Ms. Meares did not know if Davis was in the room when the Will was executed or if Davis was even in the office at all.

Deceased did not show any visible signs that made Ms. Meares think he was ill or unhealthy. Attorney Marsh reviewed the Will with Deceased, but Ms. Meares was not present for the review. Ms. Meares did not recall whether Deceased reviewed the Will before he signed it, but he did go through it and initialed each page before signing.

Ms. Meares stated that neither she nor Ms. Vitale had to leave the conference room to answer the phone or greet other clients during the execution of the Will. Deceased indicated that he was signing his Will, and she saw him sign. The Will was signed in her presence and the presence of the other witness, Lisa Vitale. Ms. Meares signed the attestation clause in the presence of Deceased and Ms. Vitale. Deceased signed the Will without any hesitation or reservation.

Martha Lucille Sherrod, another employee of Meares & Dillard, testified that she was in the room when Deceased executed the Will. Ms. Sherrod testified that Deceased, Attorney Marsh, Lisa Vitale, and Jennifer Meares also were present. Ms. Sherrod did not recall whether Davis was in the room.

Ms. Sherrod stated that someone brought Deceased to the office the day the Will was executed because, she believed, he was not driving at the time. She, however, could not recall whether Davis brought Deceased. Ms. Sherrod knew that Deceased had been ill because the fact that he was ill and had been in the hospital was mentioned and, because he physically looked like he had been ill.

Ms. Sherrod was not in the room when Deceased reviewed the Will, but she believed he had reviewed it with Attorney Marsh. Ms. Sherrod was present when Deceased went through and initialed each page of the Will. Ms. Vitale and Ms. Meares signed the Will as witnesses, and Deceased signed the Will in their presence. Ms. Vitale and Ms. Meares swore for the affidavit, and Ms. Sherrod notarized it and placed her seal upon it.

Ms. Sherrod did not notice any indication that Deceased was reluctant or hesitant to sign the Will. Deceased "knew what he was doing" when he signed the Will. Ms. Sherrod stated that after signing the Will, Deceased said he was happy to have it done.

Ms. Sherrod recalled Deceased coming in to sign the divorce complaint, but she did not recall who paid for that work.

Bob Lynch, a retired Baptist minister, testified. He met Davis when she attended Cedar Grove Baptist Church, and he met Deceased before his illness through visiting Davis's home. Mr. Lynch stated that he really got to know Deceased after Deceased became ill when he visited him in the hospital. Mr. Lynch first testified that Davis and her husband asked that he visit Deceased in the hospital. He later testified, however, that he was not certain that Davis asked him to visit Deceased. Instead, he stated that Deceased's name came to the church as a prayer request, so Mr. Lynch visited Deceased as part of his "ministerial duties." Mr. Lynch visited with Deceased both in the hospital and at Davis's home, though there was some confusion as to how often he visited. His visits were brief lasting no more than ten or fifteen minutes.

Mr. Lynch stated that Deceased was optimistic about conquering his illness and eager to return to work. When asked whether he had any conversations with Deceased about his relationship with Wife, Mr. Lynch responded: "They were not getting along. Things had deteriorated quite - - quite a bit." Mr. Lynch testified that Deceased did not ask him for any help with his marriage. Mr. Lynch did not offer to visit with Wife. Mr. Lynch met Wife a couple of times at Davis's house when she was there visiting Deceased.

Mr. Lynch testified that Deceased was upset because his daughters were not coming to visit him very often. When asked whether Deceased attributed the lack of visits to anything or any person, Mr. Lynch answered:

> Well, hard to answer because he – he felt – he felt that - - that the family was - - his family, the wife and the - - and the - - and the girls, were - - were sort of against him and against him being - - being sick and - - and not taking care of them.

Deceased had told Mr. Lynch that he was going to his parent's house when he was discharged from the hospital. When asked if Deceased told him why, Mr. Lynch stated:

> Yeah, he told me he did not feel that he was wanted at home and said that things were not good there and he - - he didn't feel like that he was wanted. And he wanted to go - - he wanted to go to his mother and dad's house.

When asked whether there were any conditions at the marital home that disturbed Deceased, Mr. Lynch stated: "There were too many animals there, he said to me."

17

When asked whether Deceased was a timid person or an assertive person, Mr. Lynch stated: "Well, as I - - I knew him when he was sick, when he was ill, and he couldn't be as - - as assertive as I - - I would suppose he was earlier. But he was pretty sure of himself." He stated further that "[Deceased] was his own man when I - - when I talked with him." Mr. Lynch testified that Deceased was able to make his own decisions and was not relying on other people to make decisions for him.

When asked whether Deceased ever mentioned a Will to him, Mr. Lynch answered:

> It - - it was mentioned one day that he - - he needed to do something because things were too unsettled. I - - I told him that he - - everybody needed one. I suggested that he ought to do it pretty soon if he was going to do something.

Mr. Lynch and Deceased never discussed whether or not Deceased made a Will.

Cay Campbell testified that she knew Deceased from elementary school, but they were not close. She did not visit Deceased in the hospital or at his parents' house, but she did speak with him once on the phone while he was staying with Davis and her husband. When Ms. Campbell called Davis's house and Deceased answered the phone Ms. Campbell thought he was his father because that is who she expected to answer. Ms. Campbell was not sure whether Deceased was on any pain medication the day that they spoke or how he was feeling at the time.

Deceased told Ms. Campbell it was the doctor's advice that he stay with his parents. When asked whether she and Deceased had any discussion about why he was staying at his parents' house and not his own home, Ms. Campbell answered: "He told me that he ended up - - was really wanting things to be over because a lot of it and as to what had happened and he told me he was sorry about as to what happened at the - - at the reunion." When asked to clarify what Deceased wanted to be over, she explained: "His marriage." Ms. Campbell testified that Deceased apologized to her for an incident that occurred years earlier at a high school reunion when Wife acted inappropriately with Ms. Campbell's husband. She testified that Deceased told her that he was ready for a divorce.

Carolyn Smith worked at UPS with Deceased and knew him for twenty-five years. Ms. Smith testified that her husband, Jack Smith, knew Deceased as well. Ms. Smith visited Terran in the hospital. Ms. Smith believed Deceased loved his daughters and that he was concerned about Terran because of her illness. Ms. Smith and her husband visited Deceased once at Fort Sanders Hospital. She also visited him twice at Blount Memorial

Hospital. Her visits lasted less than an hour. Wife and Taylor came by while Ms. Smith and her husband were visiting Deceased at Fort Sanders. She testified that Deceased's other daughter, Terran, was not with them because she also was hospitalized at that time. Ms. Smith never saw any other visitors on the two occasions that she visited Deceased at Blount Memorial.

Ms. Smith saw no evidence of a bad marriage between Deceased and Wife. Ms. Smith did see evidence of bad blood between Wife and Davis. Deceased told her he was going to his mother's house when he was discharged from the hospital "due to a multitude of cats at his - - at his home." When asked whether Deceased had anything else to say with regard to his choice to go to his parents' home, she stated: "Well, he was just fearful because of the - - having an open wound and infection, so he needed a sterile environment to - - to recover."

Marilyn Corwin testified that she had known Wife "[f]or three-ish years" through volunteering at the Blount County Animal Center, where Wife was employed. Ms. Corwin knew that Deceased was in the hospital in June and July. She visited Deceased in the hospital on the day of his surgery and saw Wife, Terran, and Taylor there. She stated this was the only time she visited Deceased in the hospital.

While Ms. Corwin did not have much interaction with Deceased: "He was polite and would greet [her] but that was pretty much it." According to Ms. Corwin, the relationship between Deceased and Wife "seemed to be a perfectly normal marital relationship . . . ." She described it as "just what [she] expected." When asked whether she had ever gotten to see Deceased and Wife interact with each other, Ms. Corwin answered: "Yes, the night after his surgery I went up to the room with her. And he was come in - - was put in bed and made comfortable by the nurses. And she went over to talk to him and they held hands and they talked a little bit."

Ms. Corwin visited Terran in the hospital several times, and she saw Deceased there. When asked whether Deceased would visit Terran prior to his hospitalization, she stated: "Absolutely. He was there quite a bit with her." When asked to describe Deceased's relationship with Terran, Ms. Corwin testified that he was concerned and worried about her. Ms. Corwin visited the home after Terran was released from surgery in July. When asked whether Terran had any observable health conditions or issues, Ms. Corwin responded:

> She had several tubes in, she had had - - you know, she was on dialysis all the time, she was trying to prepare for the - - I - - I call it personal dialysis, PD is what they call it. I'm not sure if those are the right terms; that's what I call it. She was trying to prepare for that, so she had, you know, very

serious issues going on.

Ms. Corwin testified that she was at the house Deceased shared with Wife both before his surgery and after Deceased moved into Davis's house. When asked what she observed about Wife's house before Deceased's surgery, Ms. Corwin stated:

> Well, I went there rather unexpectedly because we were volunteering at the shelter and we needed to go get a kitten and [Wife] said do you want to go with me. So she didn't know in advance that I was going to be coming to her home that day. And I walked in and I thought, I wish my house looked this good. It was neat and clean and very open and inviting. I also went downstairs where she kept the kittens that she fostered that were little - - little baby kittens, and they were in wire crates. And it was very clean. It was not stinky. It was - - you know, kittens weren't running around; they were in the crates because they were babies. And I did that on a couple of occasions and every time I went it was - - it was a very nice home, I mean - - . . . .

Ms. Corwin stated that while she was at the marital house only "two or three" times before Deceased's surgery, she visited many times after he was released from the hospital "because [Wife] needed support." When asked whether she observed any concerns like smells, cat hair, or uncleanliness on her visits, she stated: "There's always - - when you have cats in the home, there's always fur. You can't get away from it, but it wasn't excessive. It wasn't as much as is in my house." The litter boxes were always kept in the basement in the crates with the kittens.

After trial the Probate Court entered its order on April 17, 2015 finding and holding, *inter alia*, that the Will was not the product of undue influence and, therefore, was valid. The April 17, 2015 order incorporated the Probate Court's detailed memorandum opinion in which the Probate Court specifically found and held, *inter alia*:

> There's also some law that talks about having an unrestricted power of attorney, does that create a confidential relationship, which I think it does. Now, there was some discussion and argument and law, well, was it actually used, so on and so forth, but I do think that there was a confidential relationship between [Davis] and [Deceased]. And I base that upon just, well, basically the facts of this case as we heard come in through the proof.

> As it pertains to the power of attorney, I don't think that it really makes a difference when it was used or if it was used. The fact that she was in a position to be his power of attorney would imply I've got a

20

confidential relationship with you because a power of attorney is giving powers up to somebody. And, of course, they're under a fiduciary duty, but it's hard to say someone's not in a confidential relationship with somebody that they've given a power of attorney to.

Additionally, it was interesting, she actually was the person who procured the power of attorney. She typed it, she made it, and they executed it, and there were some other facts, of course, that would support that there was a confidential relationship. So I do find that . . . a confidential relationship did exist between [Davis] and [Deceased].

Now, of course, I have to go to the next step if they want to shift the burden over to the other side. Suspicious circumstances that would give rise to the presumption that the will was obtained by undue influence. So, one, [Davis] is [sic] a confidential relationship with him. What are some of the suspicious circumstances that could create a presumption. His physical and mental [sic] deteriorated such that it could overcome his freedom of choice, overcome by the actions of others.

Now, there's no question that he was in a state of physical deterioration. There's just not any question about that. Okay. Now, during this time frame that we're talking about there's not — mentally, as far as mental deterioration, I don't think there's any proof that he was mentally deteriorated. In fact, also, the contestants, they abandoned that element of attack on the will. And I think, based upon the proof that I've heard, that mentally he had not deteriorated. Obviously, he's under the stress of a very serious illness, terminal, ultimately it was a terminal illness, and so I don't think mentally deteriorated. Now, physically he had, so — and who was caring for him and under whose care was he, [Davis], so, I mean, that could create some suspicion. There's no question about it.

Active involvement in any beneficiary in procuring the will and unduly profiting from it. Well, that could be suspicious. Ultimately, we know in the end that [Davis] did profit from his will because she was a beneficiary, so she did profit from it.

The procuring of the will. That could lead to some suspicion, too, because [Davis] was [Deceased's] transportation, and she, in fact, did take him to the appointment where the will was discussed and where, ultimately, the will was executed.

21

Now, interestingly, the proof was that the appointment that led to the making of the will was not actually made by [Davis]. Actually, the inquiry initially was by his father. That's what the proof was in the case. Okay. Now, she may or may not have been there with him. She may or may not have said, hey, make that call. I don't know any of those things, but those are some interesting facts that are part of this case. But I can see how that would be suspicious circumstances. Okay.

Now, also, the case with the going to the attorney, from what the proof was, was actually based upon him going to discuss a divorce with Ms. Meares, which, of course, that's, frankly ─ and she gave testimony as to that's basically the majority of her practice is divorce. It's not estates or anything like that.

\* \* \*

So the initial appointment, apparently, was to discuss a divorce that [Deceased] wanted to file, and during that meeting is when a will was discussed. And according to Ms. Meares, that was based upon her question and intake ─ I think most attorneys call it ─ intake of a potential client. That's an area that she would always cover, and that's how it became more of a significant issue and led to the drafting of the will. But even given that, it is suspicious that [Davis] was instrumental in him getting with the attorney that actually drafted the will. Also, would led [sic] to suspicion, potentially, is that she was present during the discussions. I mean, that is a fact. Whether she participated in any of it, whether she had any influence over the will ─ when I say the will, I mean, the willpower for [Deceased]. I don't know. I'm not saying that she did. I just don't know, but she was there. One thing I noticed in my notes that Ms. Meares stated she had no recollection of [Davis] ever opining or stating anything regarding the meeting there in the conference room, even though she was present.

The testator being in an emotionally distraught state. Of course, who wouldn't be in an emotionally distraught state if you were [Deceased] and knowing what your medical situation is, so, obviously, he was in an emotionally distraught state.

Unjust or unnatural nature of the will's terms. The will attempted to disinherit [Wife], and, of course, the law doesn't allow him to absolutely disinherit her because she can elect to take against the will. So, now, you say, well, would that be unnatural, and a part of the contestants' case is that

22

they had a normal, loving relationship and everything was fine. However, we can't ignore the fact that his initial reason for going to Ms. Meares was he wanted to file a divorce. So in that regard would it be unnatural for someone who plans on divorcing their spouse to try and do what they could to make sure they couldn't inherit from them. It's probably pretty common, frankly. And, in fact, there is some law, not germane to this case, that actually deals with divorce and remarriage and what effects it has on wills. So, yes, is that unnatural as to her? Probably not, no. Unjust, of course, the law provides for that. She can elect to take against the will.

Now, unnatural as to disinheriting his two daughters. That's unnatural, I would think. That isn't a natural thing. So that leads to suspicion. Okay. So those are all issues that are out there, that confidential relationship with [Davis] and these suspicious circumstances. Based on those facts, I do think that a presumption has been created. A presumption has been created that there was undue influence based on the law and the facts.

* * *

So looking at all of the facts, is there clear and convincing evidence of the fairness of the transaction, and I'm using fairness in the legal term. So what are some of the facts. Well, let me back up and first say I think these are very relevant facts as to [Deceased], and what's in the proof of what his state of mind was as to what he was thinking. Was he frail and easily taken advantage of, or was he a decisive person. Did he know his own mind. Did he make his own decisions.

I talked about the power of attorney. On that, every indication was that [Deceased] knew what he was doing on the power of attorney when he executed it. He did it of his own free will, of his own free mind. And I talked about did it create a confidential relationship, but it's also significant how it was used, and [Davis] never used the power of attorney except one time. In fact, it was actually used after, as the proof showed, he actually executed his will, and when she did use the power of attorney she was using it explicitly at his direction. He was there and present when the power of attorney was used, and it ended up being in error, and he had to go back and redo what he was trying to accomplish.

But the testimony as to how — there was a statement, [Davis], words to her effect was, basically, he [sic] said he was sitting there and he said,

23

Momma, just go in and sign it, as to the document he was changing the beneficiaries on the insurance policies, and he had been told, and she had been told that that was acceptable there at the Farm Bureau office. So I think it created a confidential relationship as one of the factors because it existed.

But that gave a little bit of indication as to, perhaps, who's in control. Is [Deceased]? Was [Deceased] of a frail mind? He appeared to be a fairly assertive, confident person who — some of the things that Ms. Meares — some of her statements as to — let's see, here. She indicated that she did not think that he was influenced by anyone. This was a quote. She said his wishes were his and his only. These are impressions she formed of him sitting in the office. Quote, he knew what he wanted to do, close quote. She also said he was assertive in his wishes.

Now, that, and I coupled it a little bit, I mean, you're trying to get a picture of him. And then later on that day him telling his mother, Mom, just go ahead and sign it. It's indicative that he was directing what was going on down there at the office. Not she directing, he directing. But in any event, they didn't accomplish what they thought they were accomplishing that day. Then he goes back, physically goes back to the office and signs that document on a later date and time, which is another indication of he's in charge, he knows what he's doing.

Now, then you go back to this, who took him down there, and you go back, well, [Davis] took him down there. Okay. No question that to a great, great extent she was in physical control of him or just she and people at her house. He was staying there. So that indication is that was his choice, that he stayed there of his own free will. That was his choice. Now, I know that's contested by the contestants as to the will, however, other third party statements and information indicate otherwise. Again, a lot of this is based on the interview that Ms. Meares did with him, that he was living there of his own free will. He was upset with his wife. One reason he didn't want to live there was because of all the cats. Now, I know we heard testimony about that. That doesn't mean that that is, in fact, true that the cats were making a mess. This is based upon what he thought, what he said, and one of the reasons he wanted out of the house was he didn't like the cats, that he thought it was unhealthy. He even went to the point of having a conversation with Ms. Meares about there was an incident when he was in the hospital and that his wife had come, allegedly, from the animal shelter. And she was wearing her clothes from there and she'd laid

on his bed, and he felt, apparently, that that had contaminated his bed and, frankly, it annoyed him greatly, from what I can gather from the proof that I heard.

Now, whether he thought she did it intentionally or not, but the point is it annoyed and angered him. Okay. Rightfully or wrongfully, that's apparently what happened, which kind of going into his mental state. He was upset because he had tried to get his possessions from his house but was unable and he blamed his wife for that. Now, I don't know if this is the incident that involved him not being able to get into the house and him, ultimately, calling his father-in-law and him coming and unlocking the door. And during this incident, apparently, there was some unpleasantness with Taylor. She didn't want to hug him or associate with him. I don't know if this is the same incident, however, these are all facts that are adding up as to what his frame of mind and what he's thinking and why he would want to do what he wanted to do. I'm not saying it's right, I'm not saying it's wrong. These are just facts that do exist, that existed in his life that he was — and he blamed her for that.

He, apparently, went back to Ms. Meares. He was very angry with his wife and his children. He felt as though they had not visited him in the hospital enough, and, in fact, again, not right or wrong, but I don't even think it was disputed that Taylor might have visited him once. I think the proof through her own testimony in the deposition was she visited him, I think, twice from the time he went in the hospital to the time that he passed away, somewhere one, two or three times. Okay. Don't know why, not blaming anyone, but that's a fact which he would have, been cognizant of. So, apparently, that was upsetting him. He specifically told Ms. Meares that he wanted to disinherit his children and his wife. Part of the proof also was that Ms. Meares tried to dissuade him from disinheriting his children. She thought it was a mistake. Frankly, the impression — I can't remember if she said it or I formed the impression — she thought it was something that he should really think about, and, frankly, would regret, is the impression that I — but she was unable to dissuade him. That was on August the 5th.

Included in this analysis and these facts is does Ms. Meares qualify as giving independent legal advice, okay, so that's something to continue to be considered. Is it independent legal advice that could potentially rebut a clear and convincing evidence in and of itself, or is it just a fact, okay, and are there other facts that, added together, create clear and convincing evidence to rebut the fact.

25

I think this is real important, very important, that he talked about what he wanted in the will on August the 5th, 2013. The first discussion was with Ms. Meares in the context of the divorce proceeding. Then as it became apparent to her he wanted a will, then another attorney in the office, Ms. Marsh, she called her to come in and join in the meeting on August the 5th, which she did to take the lead on the will, which she did, and she sat and she discussed with [Deceased] what he wanted in the will.

He reiterated to her or stated to her — and at this point in time [Davis] is in the room, same setup as the conference room. She also stated that he was very specific. He didn't want to leave anything to his wife and his children. He didn't feel as though — this is according to her — that they visited him and they were taking her side in the divorce. This is what she said. I don't know if there'd been prior discussions regarding divorce, I don't know, but that's what she said. He was upset, basically, of their treatment of him. Okay. That was August the 5th.

And this, I think, is real important is that it wasn't one of those kind of things where he says it, they got the document right there, he signs it and goes on. They don't have the document that day. She needs to draft the document, so they leave. They don't come back until the next day, August the 6th. So there's this period of time where he gets to reflect on what he wants to do or what he's told them he wants to do and what he wants to happen, and I think that's very important in the analysis.

He does come back again. Now, who brings him back? Well, of course, he does come back with [Davis], so I mean that can be suspicious right there as to her presence. Ms. Marsh, she says that they go over the will very carefully, make sure that he reads every word in the will. He don't [sic] want any changes, he likes the will, and that the will is executed, which I found was properly executed and admitted.

So did he receive independent legal advice which would — by clear and convincing evidence independently which would rebut this presumption of undue influence. I'm not saying that the advice he received from Ms. Meares as a matter of law does not represent independent legal advice, but I'm not going to find that it does, in fact, in and of itself — in and of itself, constitute absolutely independent legal advice and, in and of itself, would be rebut to presumption of undue influence. In and of itself it does not do that. I don't think it does.

26

I do think that it is a factor, and a very important factor in the Court, considering looking at the totality of the circumstances, does the totality of the proof rise to the level by clear and convincing evidence to rebut undue influence, and I think it does. I think it does rebut that [Davis] exhibited undue influence over [Deceased] and that the will is the product of undue influence, and since I don't think it's the product of undue influence, then the will is valid. The will is valid, and the estate should be distributed pursuant to the last will and testament of [Deceased] executed on August the 6th, 2013.

Wife, Terran, and Taylor appeal the Probate Court's April 15, 2015 order to this Court.

## Discussion

Although not stated exactly as such, Wife, Terran, and Taylor raise one issue on appeal: whether the Probate Court erred in finding that clear and convincing evidence had been proven to rebut the presumption of undue influence. The Estate and the Beneficiaries raise an issue regarding whether the Probate Court erred in finding that a confidential relationship existed between Deceased and Davis giving rise to a presumption of undue influence. Logically, we address the issue raised by the Estate and the Beneficiaries first.

Our Supreme Court has explained:

In a will contest, a properly executed will may be challenged on a theory that the decedent's mind was not "sufficiently sound to enable him or her to know and understand the force and consequence of the act of making the will" at the time the will was executed. *In re Estate of Elam*, 738 S.W.2d 169, 171–72 (Tenn. 1987). As this Court has said:

The testator must have an intelligent consciousness of the nature and effect of the act, a knowledge of the property possessed and an understanding of the disposition to be made. While evidence regarding factors such as physical weakness or disease, old age, blunt perception or failing mind and memory is admissible on the issue of testamentary capacity, it is not conclusive and the testator is not thereby rendered incompetent if her mind is sufficiently sound to enable her to know and understand what she is doing.

27

*Id.* (citations omitted).

Similarly, a will may be challenged on the basis that the decedent was subject to the undue influence of another in executing the will. In Tennessee, for example, where there is a "confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (citations omitted). A confidential relationship is any relationship which gives one person dominion and control over another. *See Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989).

The burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship. *See Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence. *Matlock v. Simpson*, 902 S.W.2d at 386; *see Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979). To prove the fairness of the transaction, the dominant party may show that the weaker party received independent advice before engaging in the transaction that benefitted the dominant party. *See Hogan v. Cooper*, 619 S.W.2d 516, 519 (Tenn. 1981); *see also Richmond v. Christian*, 555 S.W.2d 105, 107–08 (Tenn. 1977) (proof that the donor received independent advice respecting the consequences and advisability of the gift) (citations omitted).

*Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002).

We first consider whether the Probate Court erred in finding that a confidential relationship existed between Deceased and Davis. In *Childress* our Supreme Court cited to *Mitchell v. Smith* wherein this Court explained:

Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). In general terms, it is any relationship which gives one person dominion and control over another. *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Turner v. Leathers*, 191 Tenn. 292, 298, 232 S.W.2d 269, 271 (1950); *Roberts v. Chase*, 25 Tenn. App. 636, 650, 166 S.W.2d 641,

28

650 (1942). It is not merely a relationship of mutual trust and confidence, but rather it is one

> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.

*Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989) (quoting *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App.1973)). "A normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and it raises no presumption of invalidity of the transaction." *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993). We see no reason why this principle should not apply as well when what is in question is a normal relationship between a mentally competent adult child and a parent, as is now the case before us.

With regard to the issue of whether the Probate Court erred in finding that a confidential relationship existed between Deceased and Davis giving rise to a presumption of undue influence, the Probate Court specifically found and held, *inter alia*:

> There's also some law that talks about having an unrestricted power of attorney, does that create a confidential relationship, which I think it does. Now, there was some discussion and argument and law, well, was it actually used, so on and so forth, but I do think that there was a confidential relationship between [Davis] and [Deceased]. And I base that upon just, well, basically the facts of this case as we heard come in through the proof.

> As it pertains to the power of attorney, I don't think that it really makes a difference when it was used or if it was used. The fact that she was in a position to be his power of attorney would imply I've got a confidential relationship with you because a power of attorney is giving powers up to somebody. And, of course, they're under a fiduciary duty, but it's hard to say someone's not in a confidential relationship with somebody that they've given a power of attorney to.

> Additionally, it was interesting, she actually was the person who procured the power of attorney. She typed it, she made it, and they executed it, and there were some other facts, of course, that would support that there was a confidential relationship. So I do find that . . . a confidential relationship did exist between [Davis] and [Deceased].

29

The Estate and the Beneficiaries argue in their briefs on appeal that the Probate Court should not have found a confidential relationship based upon the power of attorney because Davis did not exercise the power of attorney until after the execution of the Will. Our Supreme Court has instructed: "When an unrestricted power of attorney is executed but has not yet been exercised, good sense dictates that there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney." *Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002).

Although the Probate Court based its finding of a confidential relationship primarily upon the existence of the power of attorney, other evidence in the record on appeal supports the Probate Court's finding of a confidential relationship between Davis and Deceased. The evidence in the record on appeal shows that in addition to Davis holding the power of attorney for Deceased, Deceased also had appointed Davis as his health care agent; Deceased was living in Davis's home; Davis was caring for Deceased physically by providing him with meals and assistance with medical needs, among other things; Davis transported Deceased to medical appointments, his attorney's office, and the insurance company because Deceased was unable to drive; and Davis assisted Deceased with financial activities such as paying Deceased's bills. Sufficient evidence was presented to find that Deceased placed great confidence in Davis to assist him physically, medically, and financially, and that because of that confidence, Davis was in a position to exercise dominion and control over Deceased. "[I]f the Trial Judge reached the right result for the wrong reason, there is no reversible error." *Robinson v. Currey*, 153 S.W.3d 32, 40 (Tenn. Ct. App. 2004) (*quoting Shutt v. Blount*, 249 S.W.2d 904, 907 (Tenn. 1952)). As the totality of the evidence in the record on appeal supports a finding that Davis and Deceased had a confidential relationship, we will not disturb this finding made by the Probate Court.

Having affirmed the finding of a confidential relationship, we now consider whether the Probate Court erred in finding no undue influence with regard to the Will. As this Court explained in *Delapp v. Pratt*:

It is well settled in Tennessee "that the existence of a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). However, as this Court discussed in *In re: Estate of Maddox*:

Proof of the existence of a confidential relationship, by itself, will not be sufficient to invalidate a will. It is not the relationship that concerns the courts but rather the abuse of

30

the relationship. Proof of the existence of a confidential
relationship must be coupled with evidence of one or more
other suspicious circumstances that give rise to a presumption
of undue influence.

*In re: Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001) (citations
omitted).

It is rare to find direct evidence of undue influence. *Id*. at 88.
Usually, to prove undue influence, one "must prove the existence of
suspicious circumstances warranting the conclusion that the person
allegedly influenced did not act freely and independently." *Id*. "The
suspicious circumstances most frequently relied upon to establish undue
influence are: (1) the existence of a confidential relationship between the
testator and the beneficiary, (2) the testator's physical or mental
deterioration, and (3) the beneficiary's active involvement in procuring the
will." *Id*. at 89. Some other recognized suspicious circumstances are:

(1) secrecy concerning the will's existence; (2) the testator's
advanced age; (3) the lack of independent advice in preparing
the will; (4) the testator's illiteracy or blindness; (5) the unjust
or unnatural nature of the will's terms; (6) the testator being
in an emotionally distraught state; (7) discrepancies between
the will and the testator's expressed intentions; and (8) fraud
or duress directed toward the testator.

*Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989). "The courts
have refrained from prescribing the type or number of suspicious
circumstances that will warrant invalidating a will on the grounds of undue
influence." *Id*.

*Delapp v. Pratt*, 152 S.W.3d 530, 540-41 (Tenn. Ct. App. 2004).

Once a confidential relationship between Deceased and Davis was proven, a
presumption of undue influence arose and the burden shifted to Davis to prove by clear
and convincing evidence the fairness of the transaction involving the Will. *See
Childress*, 74 S.W.3d at 328. The Probate Court discussed the possible suspicious
circumstances in this case including Deceased's physical deterioration due to his serious
illness, the fact that Davis benefitted from the Will, the fact that Davis transported
Deceased to his appointments with the attorneys, and the fact that it appeared unnatural
for Deceased to disinherit his daughters. The Probate Court also considered, however,

that the proof showed that Deceased did not suffer mental deterioration and was mentally competent; that Davis did not make the appointment for Deceased to meet with the attorney; that Deceased was filing for divorce from Wife; that Deceased had expressed to multiple people that he was upset with Wife and his daughters for not visiting him more often during his illness; and that testimony from multiple witnesses established that Deceased himself made the decision to live with Davis. The Probate Court also considered the proof which showed that the one time Davis exercised the power of attorney, which was after the execution of the Will, she did so because Deceased clearly, expressly, and firmly insisted that she do so, which tends to show that Deceased and not Davis was the one in control of the situation.

The Probate Court also properly considered the testimony from the two disinterested attorneys with whom Deceased consulted about making the Will. Both of these attorneys, Attorney Meares and Attorney Marsh, testified at trial and both testified that Deceased was upset and angry with Wife and his daughters, rightly so or not, and that Deceased was very particular, specific, assertive, and firm in expressing his wishes about the Will. Attorney Meares testified that she even strongly attempted to dissuade Deceased from disinheriting his daughters, but that Deceased could not be moved from his decision. Attorney Marsh testified that she prepared the Will in accordance with Deceased's wishes. Attorney Meares testified that Deceased is the one who told her what he wanted done and that she did not see Deceased being influenced by anyone. Attorney Marsh testified that she did not see anyone influencing Deceased, and also stated that although Davis was in the room, Davis never voiced an opinion on what Deceased should put in the Will.

Wife, Terran, and Taylor argue in their brief on appeal that the Probate Court erred in considering the legal consultations between Deceased and Attorneys Meares and Marsh because Davis was present during the consultations destroying confidentiality. The Probate Court found that the advice rendered did not constitute independent legal advice sufficient by itself to rebut the presumption of undue influence because Davis was present. The Probate Court, however, also found that the legal advice rendered did constitute one factor to be considered in the totality of the circumstances, and that this factor supported the finding that the Will was not procured by undue influence. We find no error by the Probate Court in its treatment of Attorney Meares's and Attorney Marsh's testimony.

The evidence is clear and convincing, as found by the Probate Court, that it was Deceased who decided on the provisions of the Will. Whether this decision by the Deceased was 'fair' to his wife and daughters was not the question before the Probate Court or now before this Court on appeal. Given the totality of the circumstances, the evidence in the record on appeal does not preponderate against the Probate Court's

finding made by clear and convincing evidence that the Will was not procured by undue influence. We affirm the Probate Court on this issue.

## **Conclusion**

The judgment of the Probate Court is affirmed, and this cause is remanded to the Probate Court for collection of the costs below. The costs on appeal are assessed against the appellants, Christina Davis, Terran Denise Davis, and Taylor Ann Davis, and their surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE